**Cedric Lemont DOTSON, Appellant,**

v.

**STATE of Texas, Appellee.**

**No. C14–89–135–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

Jan. 18, 1990.

 

Randy McDonald, Houston, for appellant.

Lester Blizzard, Houston, for appellee.

Before PRESSLER, CANNON and ELLIS, JJ.

## OPINION

ELLIS, Justice.

Appellant, Cedric Lemont Dotson, appeals his judgment of conviction for two offenses of aggravated robbery. TEXAS PENAL CODE ANN. § 29.03 (Vernon 1989). The jury rejected appellant's not guilty plea on both counts in the indictment, and assessed punishment at 99 years confinement in the Texas Department of Corrections and a fine of ten thousand dollars on each count. We affirm.

Appellant brings three points of error on appeal. In his first point of error, appellant argues the trial court committed reversible error in failing to grant his motion to suppress the evidence based on an illegal arrest. In his second point of error, appellant submits the trial court committed re-

versible error in denying him his right to represent himself at trial by forcing him to accept representation by court-appointed counsel. In his third point of error, appellant argues the trial court abused its discretion by expelling him from the courtroom without giving him the opportunity to reclaim his right to be present.

On June 2, 1988, complainants, Patricia Bratsas and Dr. Joan Nish, were robbed at gun point in their home at 310 Shasta Drive in Hunter's Creek Village, Harris County, Texas. Patricia Bratsas had returned home on the evening of the offense between the hours of 11:00 p.m. and 12:00 a.m. When Dr. Nish opened the door to admit Ms. Bratsas, appellant grabbed Ms. Bratsas around the neck, holding a gun to her temple. Appellant's co-defendant, Murphy Celestine, then appeared. Both men forced their way into the house. Dr. Nish was twice pushed against a wall and also thrown to the floor. Appellant's co-defendant, Murphy Celestine, repeatedly demanded of Dr. Nish that she not look at him and he forced a rug over Dr. Nish.

Appellant released his grip on Bratsas but continued to threaten her with a gun. Appellant then demanded to know where the safe, money and jewels were. Appellant and Murphy Celestine found some jewelry, including a college ring belonging to Bratsas. When appellant and Murphy Celestine left, the complainants called the police.

On June 24, 1988, Officers Toma and Peterson of the West University Police Department were removing a vehicle from the middle of Kirby Drive in West University. Officer Toma spotted a blue Volvo which looked exactly like the one Toma and Peterson had noticed the week before when they had responded to a robbery on Georgetown in West University. Officer Peterson testified that when they had approached the Georgetown crime scene, they noticed a dark blue, roughly 1975 Volvo, parked on a side street approximately one-half block away and the parked Volvo was occupied by a black male. Peterson further testified

that he thought the Volvo was a 1975 model which was different from '85 or '86 or '89 models. After the officers passed the blue Volvo, it turned and headed north on Buffalo Speedway. Peterson testified the initial call said the Georgetown robbery was twenty minutes old but that in getting back with dispatch he learned the robbery was only twenty seconds old.

Appellant was a passenger in the blue Volvo spotted by Officer Toma on June 24, 1988, which was travelling northbound in the 6300 block of Kirby Drive. Murphy Celestine was the driver. When Toma and Peterson recognized that the Volvo looked exactly like the one they had observed the night of the Georgetown robbery, Peterson left his patrol car and walked over to the blue Volvo. Peterson stated, "I want to talk to you and if you will pull it right on over there." Peterson pointed to a vacant spot where the driver could park. The driver nodded yes and proceeded to turn the Volvo onto the 2700 block of Dryden, eastbound, slowing down initially. When Peterson's patrol car pulled up behind the Volvo, the Volvo emerged into moving eastbound traffic on Dryden at a high rate of speed. A chase ensued with Officers Peterson and Toma in pursuit, each officer driving his own patrol car. Peterson testified that, during the chase, speeds reached close to 90 miles per hour. The Volvo collided with a tree, bursting into flames and overturning with the passenger's side face down on the ground. The driver, Murphy Celestine, crawled out of the driver's window and ran towards a vacant lot. Peterson followed on foot, eventually apprehending and arresting Celestine. Meanwhile, appellant was pulled from the wreckage in an unconscious condition.

Donald E. Bush, a West University police officer, testified that he inventoried the blue Volvo on June 24, 1988 at the site of the wreckage. Bush testified that he observed a pistol in the right window area which he recovered. After the wrecking service turned the Volvo right side up, Bush then recovered a second gun inside a

brief case found in the trunk of the Volvo. Bush testified that his purpose for going inside the trunk and the brief case was to inventory the contents and to prepare the car for towing. He stated this was the standard policy of the West University Police Department for wrecked vehicles involved in a pursuit which were to be impounded. Finally, Bush testified that Officer Nimmo of the Houston Police Department had given Bush another weapon found by Nimmo in the actual engine compartment of the wrecked Volvo at the scene of the collision.

On June 28, 1988, Detective Gary Ackers accompanied two other West University Police Department officers to the Houston Wrecker Service at 2227 Bissonnet where the partially burned Volvo was stored. Ackers looked inside the Volvo and found a pawn slip located on the floor board. The pawn slip was signed in longhand with the name "Murphy Celestine," in the space provided on the slip for the name of the pledgor. Ackers took the pawn slip from the Volvo and went to the designated pawn shop where he retrieved the college ring of Patricia Bratsas which had been stolen in the Hunter's Creek robbery of June 2, 1988. At trial, Bratsas identified her college ring which had the name, "Patricia Bratsas" inscribed on it.

Prior to trial, Bratsas viewed two lineups conducted at the Houston Police Department and made positive identifications of both appellant and Celestine. At trial, Bratsas identified appellant and Celestine. Prior to trial, Dr. Nish viewed two video lineups and was able to identify Celestine but not appellant. At trial, Dr. Nish did identify appellant, but she was not able to identify Celestine. Bratsas testified at trial that she did not know the difference between guns, but that one of the guns found in the blue Volvo (State's Exhibit No. 2) appeared to be about the same size and shape as the one Bratsas saw in appellant's hand on June 2, 1988.

■ In his first point of error, appellant contends that officer Peterson of the West University Police ordered co-defendant Celestine, the driver of the car in which appellant was a passenger, to pull out of traffic and stop with no articulable factual basis for so doing. The trial court is the sole finder of fact in the suppression hearing. *Walker v. State*, 588 S.W.2d 920, 924 (Tex. Crim.App.1979). Upon review, the evidence adduced at the suppression hearing is viewed in the light most favorable to the trial court's ruling in determining whether the trial court abused its discretion in denying the motion to suppress. *Walker* at 924.

■ In light of this standard of review, the operative facts are as follows: Officer Peterson testified he walked over near the Volvo on Kirby Drive and stated to the driver, "I want to talk to you and if you will pull it right on over there." Peterson pointed to a vacant lot where the driver could park. Peterson further testified the driver responded by nodding his head in assent and also by turning the Volvo into the 2700 block of Dryden, slowing down initially. When Peterson's patrol car pulled up behind the Volvo, the Volvo emerged into moving eastbound traffic on Dryden at a high rate of speed. Peterson stated the rate of speed during the ensuing chase reached 90 miles per hour.

In his brief, appellant has characterized Peterson's initial encounter with the driver of the blue Volvo as an investigatory stop. We disagree. Not all encounters between police and citizens invoke the protection of the Fourth Amendment. *Daniels v. State*, 718 S.W.2d 702 (Tex.Crim.App.1986) citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Police are at liberty to approach and make inquiries of their fellow citizens. It was permissible for Officer Peterson to ask the driver of the Volvo, Murphy Celestine, to pull over. At that point, at least in theory, the driver still could have refused to pull over. Following the initial exchange and the driver's subsequent manifestation of consent to pull over, the driver elected instead to proceed into moving traffic. Peterson then followed the

Volvo. Police are as free as anyone else to follow their fellow citizens. It was the ensuing high speed car chase culminating in the Volvo's collision with a tree which provided the legal basis for apprehending appellant and his co-defendant, the Volvo's driver, Murphy Celestine. Appellant is absolutely correct in asserting that Peterson had no grounds for reasonable suspicion at the point of his initial encounter with the driver of the Volvo. The fact is that Peterson needed none. The driver, Celestine, and appellant were not then detained by Peterson for purposes of the Fourth Amendment. We re-iterate that the police do not need reasonable suspicion every time they wish to communicate with a citizen. *Garcia v. State*, 704 S.W.2d 512 (Tex. App.—Houston [14th Dist.] 1986, pet ref'd).

■ A substantial portion of the complained of evidence was eventually obtained as the result of a routine inventory search in compliance with standard policy of the West University Police Department concerning wrecked vehicles involved in car chases. Inventory searches conducted pursuant to standard police procedure are reasonable. *Starlling v. State*, 743 S.W.2d 767 (Tex.App.—Fort Worth 1988, pet. ref'd). A car can be validly impounded and inventoried where the driver is removed from his automobile and placed under custodial arrest and no other alternatives are available other than impoundment. *Delgado v. State*, 718 S.W.2d 718, 721 (Tex.Crim. App.1986). At the motion to suppress hearing, Officer Bush of the West University Police testified his purpose for searching inside the trunk and the brief case was to inventory the contents and to prepare the partially burned car for towing. He stated this was the standard policy of the West University Police Department for wrecked vehicles involved in a pursuit which were to be impounded. The complained of evidence consisted of a pistol recovered from the passenger side of the Volvo, a gun found inside the engine and a pistol found in a briefcase inside the trunk. The Volvo was then impounded for storage with a private wrecker service.

In their supplemental briefs and subsequent citations to case law, both appellant and the State have responded to our question posed at oral submission concerning the validity of the warrantless search of the Volvo conducted on June 28, 1988, four days after the police inventory was completed. This warrantless search produced the pawn slip found by Detective Ackers on the floorboard of the Volvo which, in turn, yielded the class ring of Patricia Bratsas.

■ A defendant who is a passenger in an automobile in which proceeds from robbery and weapons are found has no expectation of privacy in the car or its contents and thus, he is not entitled to contest the legality of the search and seizure of the automobile or its contents. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Chaisson v. State*, 761 S.W.2d 77, 82 (Tex.App.—Beaumont 1988, no pet.). In the case before us, appellant was a mere passenger in the blue Volvo. Further, the pawn slip bore the name of "Celestine Murphy" as the pledgor. Appellant did not testify at trial and thus failed to establish that he had a privacy interest that was violated. *Garces v. State*, 727 S.W.2d 48, 49 (Tex.App.—Houston [14th Dist.] pet. ref'd). We hold that under the facts of this case, appellant failed to show that he had sufficient standing to contest the search of the Volvo. Appellant's first point of error is overruled.

■ In his second point of error, appellant complains of the trial court's denial of his right to defend himself at trial by forcing appellant to accept court appointed counsel. Appellant refers this court to the exchange between appellant and the trial judge wherein appellant notified the trial court that he had some argument he wished to make before the jury:

DEFENDANT: I would like to approach the bench today and state my argument. I would like to raise some arguments to the jury and also to you.

THE COURT: You do that through your attorney. Do you understand that?

DEFENDANT: Yes, sir.

THE COURT: I want you to act like a gentleman before the jury because that will make the best impression for your case is to act right before them. (sic).

DEFENDANT: Some argument raised by the D.A. was not objected to in my case.

THE COURT: They are not arguing as far as they are presenting testimony right now. You talk to your attorney on what you want her to say and she will advise you because that's what she does, she advises you whether it's permissible or not.

DEFENDANT: If you are saying I cannot approach the bench today.

THE COURT: You have just done it. Just have a seat and bring in the jury, David. Mr. Dotson, Mr. Dotson, one thing straight up, if you act up before the jury, I'm going to tape you to that chair. Do you understand that? I want you to act right so you make a good impression.

DEFENDANT: I was requesting you, Mr. McSpadden, that I would like to stand before the, approach the bench today.

THE COURT: You have just done it.

THE DEFENDANT: Y'all are going to have to tape me down because I'm going to voice my objection. I got to do this time. (sic).

THE COURT: If you do it, I'm going to tape you to the chair. I'm going to tape your mouth shut and you are not going to look real good for that jury. Fair warning.

■ We hold that it was not error for the trial court to deny appellant's motion to argue before the jury. The Court of Criminal Appeals has consistently held that there is no right to "hybrid" representation. *Rougeau v. State*, 738 S.W.2d 651, 666 (Tex.Crim.App.1987); *Busselman v. State*, 713 S.W.2d 711, 714 (Tex.App.— Houston [1st Dist.] 1986, no pet.) citing *Landers v. State*, 550 S.W.2d 272, 275 (Tex.

Crim.App.1977) (op. on reh'g). Further, if an indigent defendant such as appellant is displeased with his appointed counsel, he must timely bring the matter to the court's attention. *Hubbard v. State*, 739 S.W.2d 341, 344 (Tex.Crim.App.1987). The record reveals appellant's claimed assertion of the right to defend pro se was untimely since it was made after the jury was impaneled. *Blankenship v. State*, 673 S.W.2d 578, 585 (Tex.Crim.App.1984) Accordingly, the trial judge was entitled to look solely to appellant's attorney and was not required to consider appellant's pro se motion. Appellant's second point of error is overruled.

■ In his third point of error, appellant complains that the trial court abused its discretion by expelling him from the courtroom without providing him with the opportunity to reclaim his right to be present. The second exchange between the court and appellant occurred during defense counsel's cross-examination of Officer Peterson of the West University Police:

THE COURT: Out of the presence of the jury. Mr. Dotson, I'm going to leave it up to you. It is your choice. I care less which way you go. You either let your attorney handle it and no more disruption before this jury—

DEFENDANT: I'm not being defended adequately in this case.

THE COURT: —or I'm going to tape you to your seat. You make the choice.

DEFENDANT: I'm going to state my opinion.

THE COURT: Let's tape him down. Let's handcuff him and tape his mouth. Sit down.

DEFENDANT: I'm not being tape down. (sic)

BAILIFF: You are going to be taped down.

DEFENDANT: Your're going to have to beat me down.

BAILIFF: Is that the way you want it?

DEFENDANT: That's how it's going to have to be.

BAILIFF: Let's go. Let's go.

(WHEREUP, AFTER BEING DETAINED BY THE DEPUTIES IN THE COURT, THE DEFENDANT WAS REMOVED FROM THE COURTROOM.)

In his brief, appellant refers this court to *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) wherein the U.S. Supreme Court held that there are several constitutionally permissible ways for a trial judge to handle a disruptive defendant, including "taking him out of the courtroom until he promises to conduct himself properly." *Id.* at 345, 90 S.Ct. at 1061. Appellant insists that the trial judge did not comply with *Illinois v. Allen* because he wrongfully denied appellant the opportunity to agree to conduct himself properly. The State counters that *Illinois v. Allen* reads in relevant part as follows:

It is essential to the proper administration of criminal justice that dignity, order, and decorum be hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. *We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations.* We think there are at least three contitutionally permissible ways for a trial judge to handle an obstreperous defendant like Allen: (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly. *Id.* at 344–345, 90 S.Ct. at 1061.

We agree with the State's position that the Supreme Court, in *Illinois v. Allen,* did not prescribe a rigid and precise formula by which trial judges are to respond to disruptive defendants. On the contrary, the Supreme Court provided trial judges with wide discretion. Our review of the docket sheet reveals that appellant was removed from the courtroom at 11:02 a.m.

which was 16 minutes prior to the closing of evidence on guilt or innocence. The trial court then recessed for lunch until 1:10 p.m. and arguments concluded at 1:38 p.m. At 2:20 p.m. the jury returned a verdict of guitly on both counts of aggravated robbery. At 2:45 p.m. testimony commenced on punishment. At 2:55 p.m. arguments commenced on punishment, concluding at 3:00 p.m. The jury deliberated until 4:30 p.m. when it returned its verdict. In summary, after the trial court warned appellant that he would be taped to his seat if he persisted in disrupting the proceedings, appellant engaged in a violent scuffle with the bailiff, resulting in appellant's confinement in a holding cell. We find no abuse of discretion by the trial judge in removing appellant from the courtroom without subsequently inquiring of the defendant whether he would behave if he returned to the courtroom. Appellant's point of error three is overruled.

Accordingly, the judgment of the trial court is affirmed.