**Ty S. DOUGLAS, Petitioner,**

v.

**STATE of Alaska, Respondent.**

**No. S–12857.**

Supreme Court of Alaska.

Aug. 14, 2009.

---

David D. Reineke and Alexandra Foote–Jones, Assistant Public Defenders, and Quinlan Steiner, Public Defender, Anchorage, for Petitioner. Tamara E. de Lucia, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for Respondent.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

After Ty Douglas repeatedly and egregiously misbehaved during pretrial hearings for two years, the trial court excluded him from the courtroom during his jury trial on charges of witness tampering and unlawful contact, but allowed him to participate by speakerphone. Midtrial Douglas asked to testify in person. The trial court denied this request after finding that Douglas's promise to behave was not credible. After Douglas was convicted, the court of appeals affirmed. Douglas has petitioned for hearing.

A trial court may exclude a criminal defendant for disruptive behavior. Although the court must allow an excluded criminal defendant an opportunity to reclaim his right to be present if he demonstrates willingness to behave appropriately, it is not obliged to uncritically accept every promise to behave. The trial court did not abuse its discretion either by removing Douglas from the courtroom or by refusing his later request to reenter. We therefore affirm the court of appeals' opinion affirming Douglas's conviction.

## II. FACTS AND PROCEEDINGS

Ty Douglas was charged with sexually assaulting and beating his girlfriend, K.I.[1] Douglas was prohibited from having any contact with K.I. while the assault case was pending. While Douglas was in custody awaiting trial on those charges, 828 calls to K.I. were placed from the jail where Douglas was being held. K.I. wrote a letter to the district attorney recanting her allegations that Douglas had assaulted her and saying that she caused her own injuries. Shortly

thereafter K.I. told a police officer that Douglas had been calling her from the jail and that she had been taking his calls. Consequently, in October 2002, even before the assault case went to trial, Douglas was also charged with three counts of first-degree witness tampering,[2] ten counts of first-degree unlawful contact,[3] and ten counts of attempted first-degree unlawful contact.[4]

The assault case went to trial first. Superior Court Judge Larry R. Weeks presided.[5] Douglas was apparently present in the courtroom during the trial.[6] When the jury returned guilty verdicts on all of the assault charges, Douglas spat at the jurors and spectators and said he hoped they contracted diseases.[7] Judge Weeks ordered Douglas physically restrained at all further hearings in the assault case.[8] The assault convictions were ultimately affirmed on appeal.[9]

The trial on the witness tampering and unlawful contact charges was assigned to Superior Court Judge Michael A. Thompson, but trial was delayed pending the outcome of the assault case.

During the two-year period in which Judge Thompson held a series of pretrial hearings in the witness tampering case, Douglas's behavior was gravely disruptive and disrespectful. The court of appeals' published opinion accurately describes Douglas's misbehavior in great detail.[10] Douglas frequently interrupted the proceedings in the witness tampering case, often to argue facts relevant only to the sexual assault case. He repeatedly insulted the prosecutor, his own attorneys, and Judge Thompson during these hearings. The court of appeals stated:

> [At a calendar call on January 16, 2004] Douglas told Judge Thompson that he wanted to represent himself. Douglas

1. *Douglas v. State (Douglas I)*, 151 P.3d 495, 497–98 (Alaska App.2006).

2. AS 11.56.540(a)(1).

3. AS 11.56.750(a).

4. AS 11.31.100(a); AS 11.56.750(a).

5. *Douglas I*, 151 P.3d at 495.

6. *Douglas v. State (Douglas II)*, 166 P.3d 61, 65 (Alaska App.2007).

7. *Id.* at 65.

8. *Id.*

9. *Douglas I*, 151 P.3d at 497, 507. Douglas did not appeal Judge Weeks's decision to restrain him in that case. *Id.* at 497.

10. *Douglas II*, 166 P.3d at 65–83.

then launched into a lengthy recitation of complaints about the way his former attorney had mishandled the sexual assault trial. Douglas proclaimed his innocence, and he suggested that he had been convicted of sexual assault through the bad faith and improper conduct of the authorities, as well as the incompetence of his own attorney.

. . . .

Toward the end of [a March 2, 2004] hearing, Douglas suddenly erupted with invective and charges of corruption against the prosecutor. Douglas himself suggested that he should participate telephonically in future hearings, so that he would not have to look at the prosecutor.

... (Extensive transcript passages omitted.)

[O]n June 3, 2004, Judge Thompson held a hearing[, at which Douglas appears to have been present in court,] to set a date for the witness tampering trial.

. . . .

Douglas ... interrupted [the court], proclaiming at length that the prosecutor was suppressing evidence that would have demonstrated his innocence of the sexual assault charges, and that his own attorney was refusing or neglecting to file important motions. During his remarks, Douglas insulted and swore at his own attorney, the prosecutor, and Judge Thompson. In the end, Douglas's behavior led Judge Thompson to declare that Douglas would be excluded from further hearings in the case. ... (Extensive transcript passages omitted.)

The pre-trial motion hearing was held on June 14th.... Douglas ... personally attended this hearing.

. . . .

Douglas again gratuitously insulted the defense attorney, declared that the attorney was incompetent, and asked Judge Thompson to dismiss the attorney and appoint a new one. Douglas also again gratuitously insulted the prosecutor and declared that the prosecutor was guilty of criminal conduct.

Toward the end of this conversation, Douglas launched into a soliloquy that was unrelated to the procedural issues that the attorneys and the judge were discussing— a soliloquy in which Douglas asserted that the evidence showed that he was innocent of the sexual assaults.

Based on Douglas's behavior, Judge Thompson again ruled that Douglas would not be allowed to attend the trial.

... (Extensive transcript passages omitted.)

[On June 15, 2004, Judge Thompson ordered that Douglas undergo a competency evaluation.]

... (Extensive transcript passages omitted.)

[T]oward the end of August 2004, Judge Thompson held a hearing to announce the result of the mental examination: the psychologist from API had concluded that Douglas was competent to stand trial.

. . . .

When Judge Thompson announced the result of the mental evaluation, Douglas responded with another rambling protestation that he had been unjustly convicted of the sexual assaults, and he again asked Judge Thompson to appoint him a new attorney, but the judge again refused.[11]

Douglas had three noteworthy outbursts that are not described in detail in the court of appeals' opinion. At the January 16, 2004 calendar call, Douglas asked about prosecuting the prosecutor for perjury and called the prosecutor a "Nazi bastard." At an August 20, 2004 status hearing, Douglas argued that his attorney should be removed. He also discussed the evidence from the assault trial and argued that he should not have been convicted in the assault trial because the victim was "a liar." On August 27, 2004, there was another outburst, which we describe in detail below.

Douglas also had difficulty dealing with his own attorneys. He was represented by at least seven different attorneys in the superi-

11. *Id.* at 67–76.

or court,[12] and he struck one of the attorneys who represented him on the witness tampering charges in the face.

During the hearings in which Douglas exhibited disruptive conduct, Judge Thompson repeatedly interjected when Douglas discussed facts relevant only to the assault case, and stated there was nothing he, Judge Thompson, could do about the assault trial. Judge Thompson also repeatedly warned Douglas that if he continued to engage in disruptive behavior, he would be removed from the courtroom.

The jury trial on the witness tampering charges had been scheduled to begin June 15, 2004. On June 3, 2004, Judge Thompson stated from the bench that he planned to exclude Douglas from trial because Douglas could not control himself. On June 14, 2004, Judge Thompson reiterated that intention, explaining that "the jury ... would be looking for ways ... to throttle Mr. Douglas, if not convict him, and ... under the circumstances he can't get a fair trial if he's in the courtroom." Douglas was present in the courtroom when Judge Thompson made these comments. Douglas certainly heard and responded to the remarks. The next day Judge Thompson concluded that Douglas had "forfeited" his right to be present, because Douglas refused to behave himself despite what Judge Thompson called the court's "pressuring and cajolery and threats." Judge Thompson stated that Douglas "would just simply prejudice the jury against himself" and that he was not willing to subdue Douglas with "mechanical or medical means" just so Douglas could be present in the courtroom. Douglas's attorney objected to the exclusion. Judge Thompson said that the court would take "frequent breaks" to give Douglas's attorney an opportunity to confer with Douglas.

On June 15, 2004, when the trial was about to commence, Judge Thompson ordered a competency evaluation at the request of Douglas's attorney, and continued the trial

until August 31. The psychologist who evaluated Douglas reported that Douglas was competent to stand trial and that "[t]o the extent that he does not cooperate with his attorney, it is because he chooses not to do so." The psychologist stated that Douglas was "capable of conforming his behavior to courtroom protocol" but was "just not willing to do so," and that Douglas "can be expected to publicly vent his frustration as a form of protesting his circumstances."

On August 27, 2004, at the final status hearing before the rescheduled trial, Douglas was again disruptive and disrespectful. He interrupted the proceedings to argue facts relevant only to the assault case, accused the prosecutor of misconduct and called him "insane," and called his own attorney an "idiot" and a "liar." Douglas told the court "this is the reason why America is trashed. It's from people like you [Judge Thompson] and—and this defense attorney. You people are bringing this country down to its knees on frivolous bullshit.... You liberal assholes."

The following passage, from the August 27 final pretrial hearing, typifies the tone and substance of what Douglas had been saying at hearings for nearly two years in the witness tampering case:[13]

> [I]t was an illegal sentencing and an illegal conviction because false evidence was given to the jury, false evidence by [the district attorney]. There's no way that—he—he just embellished everything that—embellishing, I mean he made things up, that fisting and there was no blood in the vagina, you know ... and there was a Pap smear. There was a Pap smear and he said I was fisting her and she was drenched in blood.
>
> . . . .
>
> There was no test that concluded that that blood came from there. There was nothing wet. The only thing—body bleeding was me and one of her hemorrhoids for

---

12. Douglas's first two attorneys withdrew because they had conflicts of interest.

13. The court of appeals opinion sets out verbatim exchanges between Douglas and the court on at least eight different occasions, beginning with an exchange on November 20, 2003. *Douglas II*, 166 P.3d at 65–80.

being kicked after—while she was biting my thumbnail.

. . . .

I'm going to win my appeals. There's no way, there's no proof of penetration here and that's what it takes, and she bit my thumb. I mean she bit my thumb. She admitted to biting my thumb and she admitted that I kicked her while she was biting my thumb, and those are the only marks that she has on her. Nothing—nothing internal, nothing wrong with her. The evidence proves it.

Douglas's three-day jury trial began August 31, 2004. Per Judge Thompson's previous ruling, Douglas was not present in the courtroom. Department of Corrections personnel held Douglas in a different room in the courthouse, where he was permitted to listen to the proceedings by speakerphone. On the first day, before jury selection began, Douglas, via the speakerphone, interrupted a pretrial evidentiary hearing to again argue facts relevant only to the assault case. Judge Thompson stated that he was excluding Douglas because Douglas "wouldn't or couldn't let anybody else get a word in edgewise." Judge Thompson stated that "we just can't get anything done with him in here," and that he could not "subject the jury" to Douglas's misbehavior. Judge Thompson reiterated his willingness to take breaks and provide Douglas with paper and pen so Douglas could communicate with his attorney.

Evidentiary hearings and jury selection took place on August 31, and the state presented its case on September 1. Douglas was not in the courtroom when the state presented its case. K.I. testified that she spoke to Douglas at least ten times while he was in custody, that he attempted to contact her on other occasions, and that during at least four of those conversations he asked her to change her story about the assault. K.I. had written a letter to the district attorney recanting the assault allegations, but she testified that she sent the letter at Douglas's request and that its contents were untrue.

After the state rested and the jury was out of the courtroom, Douglas informed the court by speakerphone that he wished to testify, but only if he could do so in person. In explaining why he wanted to testify, Douglas stated that allowing K.I. to testify outside of his presence was "the biggest farce [he had] ever heard of," and that he "wanted [the jury] to see a face rather than a picture." The prosecutor expressed concern about Douglas's "spitting and lunging" behavior during the assault trial. Judge Thompson said he had no intention of allowing Douglas in the courtroom while the jury was there. Douglas called the prosecutor and the court "fucking moron[s]." Judge Thompson then allowed Douglas's microphone to be cut off and stated:

The point is he wants to testify but he can't confine himself either to relevant matter, he won't answer questions, I mean, because I've tried to ask him questions during hearings. He will not pay any attention to the question I ask, he won't answer the question I ask; he just wants to make speeches. And his speeches ramble and include all kinds of prejudicial material that I would never admit against either [K.I.]'s interest, against [the prosecutor], against his own attorney, aside from what he thinks about me. And, you know, I think we all have to face the facts.

If he comes in here and carries on like this, which is the only way I can assume he will carry on because every hearing I've had with him for the last six months he's carried on like this, the jury is going to make short work of the verdict in this case. They're going to see somebody that probably ought to be locked up, and that's all they're going to see. And I think he's going to prejudice himself.

I don't take it lightly because this, in effect, strips him of certain constitutional rights, but, you know, he's doing the stripping, I'm not. I mean just simply can't permit him to come in here and turn this place into a circus or a wrestling match and I'm just not going to do it.

So I think I understood what he said is—what he just said, among other things, was that, no, he won't testify unless he's going to be able to sit here and look the jury in the eye while he does it. I wish he could do that. I wish it were so. I can't

permit, though, Mr. Douglas to come up here and carry on in this fashion, in this high-handed fashion that he insists on doing.

Judge Thompson allowed Douglas's microphone to be turned back on so his attorney could ask Douglas whether he wished to testify over the speakerphone. Douglas reiterated his request to testify in person, stating that he wished to "tell the story of this entire episode and exhibit the proof, which my lawyers did not do," and that he had "all the proof, documents, medical records, everything that proves that she is a liar."

In an apparent attempt to assure the court that he would not behave disruptively in front of the jury, Douglas stated:

> I didn't act up in front of the jury last time until after the verdict. They were fine. We were fine with the jury. I sat there through the whole trial. I didn't want to mess up in front of the jury and I don't want to mess up in front of this jury, and I won't. . . . I'm not going to sabotage myself in front of the jury. I'm going to show myself calmly.
>
> . . . .
>
> There's no reason for me to get upset in front of that jury. I don't want to make those people upset. Now after it's over, don't bring me back in there for the reading of the verdict. . . . I'm not going to act out.

After Douglas promised to "show [himself] calmly," he discussed at length the testimony he planned to offer, much of which was relevant only to the assault trial.

Judge Thompson denied Douglas's request to testify in person, saying "I can't bring Mr. Douglas in here," to which Douglas's attorney replied, "I'm not asking you to." The court stated that if Douglas was permitted to testify, the state would have a right to cross-examine Douglas, and that the court believed that Douglas "would not answer their ques-

tions except with invective and insults," which would require the court to strike the testimony and leave the jury "hopelessly prejudiced against" Douglas.

Douglas did not testify at trial. The jury found him guilty on all submitted counts. At the November 23, 2004 sentencing, Judge Thompson noted that Douglas "sound[ed] . . . more calm and collected," but Douglas once again repeatedly interrupted the court to discuss facts relevant only to the assault case.

Douglas appealed to the court of appeals, arguing that the trial court was obliged to allow him to be present in the courtroom once he stated that he would conduct himself appropriately in front of the jury.[14] The court of appeals affirmed his convictions, holding that the trial court did not abuse its discretion in removing Douglas and not allowing him to reenter the courtroom during the trial.[15]

Douglas petitioned for hearing. We granted his petition and ordered full briefing to consider whether the trial court erred when it initially excluded Douglas from the courtroom or when it refused to allow Douglas to return after he asked to testify and stated that he would not act out.

## III. DISCUSSION

### A. Standard of Review

We have not yet stated what standard applies for reviewing trial court orders excluding disruptive criminal defendants from trial. In *Illinois v. Allen*,[16] the seminal Supreme Court case on the issue, the Court impliedly applied an abuse of discretion standard, in stating that "trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case," and in holding that the trial judge acted "completely within his discretion."[17]

---

14. *Id.* at 65.

15. *Id.* at 81, 83. Douglas's appeal to the court of appeals included additional issues, *id.* at 83–90, which his petition for hearing explicitly waives.

16. *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (holding that trial court

acted within its discretion by removing criminal defendant from court during trial, after defendant behaved disruptively).

17. *Id.* at 343, 347, 90 S.Ct. 1057.

The great majority of jurisdictions considering the standard of review for trial court decisions to

In *Rae v. State*[18] the Alaska Court of Appeals, applying *Allen,* reviewed for abuse of discretion a trial court's decision to bind and gag a defendant after disruptive and violent outbursts.[19]

We recognize that the decision to remove or restrain a disruptive criminal defendant implicates important constitutional rights, such as the right to confront witnesses, the right to due process of law, and the privilege to testify.[20] We nevertheless conclude that a trial court's decision to remove or restrain a disruptive criminal defendant under *Allen* is subject to review for abuse of discretion. The trial court is charged with maintaining courtroom decorum, and it is in the best position to assess how disruptive a defendant's behavior is and how likely it is to continue. Because a trial court's denial of a defendant's request to return to the courtroom, whether to confront witnesses or testify, in essence involves the same constitutional rights and institutional needs and has an equivalent effect, it is likewise reviewed for abuse of discretion. "A court abuses its discretion if it issues a decision that is arbitrary, capricious, manifestly unreasonable, or stems from an improper motive."[21]

■ "We use our independent judgment in reviewing rulings turning on federal and state constitutional law."[22] We adopt "the rule of law that is most persuasive in light of precedent, reason, and policy."[23]

## B.  Whether It Was an Abuse of Discretion To Order Douglas Removed from the Courtroom

■■ The right of a criminal defendant to be present at every stage of trial is rooted in the right to confront adverse witnesses[24] and the right to due process of law.[25] But, as Douglas's opening brief acknowledges, the right to be present at trial is not absolute. In *Allen* the Supreme Court held that although "courts must indulge every reasonable presumption against the loss of constitutional rights," a defendant may forfeit the right to be present at trial if "after he has

remove or restrain defendants under the test enunciated in *Allen* review for abuse of discretion. *Spain v. Rushen,* 883 F.2d 712, 716, 725 (9th Cir.1989); *United States v. Ives,* 504 F.2d 935, 942 (9th Cir.1974), *vacated on grounds not relevant here sub nom. Ives v. United States,* 421 U.S. 944, 95 S.Ct. 1671, 44 L.Ed.2d 97 (1975), *reinstated in relevant part,* 547 F.2d 1100 (9th Cir.1976); *United States v. Munn,* 507 F.2d 563, 568 (10th Cir.1974); *Goston v. State,* 327 Ark. 486, 939 S.W.2d 818, 819 (1997); *State v. Jones,* 281 Conn. 613, 916 A.2d 17, 35 (2007); *State v. Gillam,* 629 N.W.2d 440, 450, 452 (Minn.2001); *People v. Powell,* 293 A.D.2d 423, 740 N.Y.S.2d 859, 859 (N.Y.App.Div.2002); *Dotson v. State,* 785 S.W.2d 848, 853–54 (Tex.App.1990); *State v. Chapple,* 145 Wash.2d 310, 36 P.3d 1025, 1030 (2001) (en banc). Only one jurisdiction seems to give de novo review. *State v. Aceto,* 323 Mont. 24, 100 P.3d 629, 632 (2004).

18.  *Rae v. State,* 884 P.2d 163 (Alaska App.1994) (holding that trial court abused its discretion in ordering defendant bound and gagged during trial without holding full hearing).

19.  *Id.* at 165.

20.  *Allen,* 397 U.S. at 338, 90 S.Ct. 1057; *Ives,* 504 F.2d at 941–42; *Chavez v. Pulley,* 623 F.Supp. 672, 681–82 (E.D.Cal.1985).

21.  *Shea v. State, Dep't of Admin., Div. of Ret. & Benefits,* 204 P.3d 1023, 1026 (Alaska 2009) (internal quotation marks and alteration omitted) (quoting *Dobrova v. State, Dep't of Revenue, Child Support Servs. Div.,* 171 P.3d 152, 156 (Alaska 2007)).

22.  *State v. Smart,* 202 P.3d 1130, 1134 (Alaska 2009) (citing *Grinols v. State,* 74 P.3d 889, 891 (Alaska 2003); *Todd v. State,* 917 P.2d 674, 677 (Alaska 1996)).

23.  *Grinols,* 74 P.3d at 891 (citing *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

24.  U.S. Const. amend. VI; Alaska Const. art. I, § XI; *Allen,* 397 U.S. at 338, 90 S.Ct. 1057 ("One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial." (citing *Lewis v. United States,* 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892))).

25.  U.S. Const. amend. XIV; Alaska Const. art. I, § VII; *United States v. Gagnon,* 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (stating that the right to be present at trial "is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him"); *Wamser v. State,* 652 P.2d 98, 101 n. 10 (Alaska 1982) ("[I]n Alaska the right to be present is founded on the state constitutional rights of the accused to due process and to confront the witnesses against him." (citing *Dixon v. State,* 605 P.2d 882, 884 (Alaska 1980); *State v. Hannagan,* 559 P.2d 1059, 1063 (Alaska 1977))).

been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." [26]

The Court identified three "constitutionally permissible" ways a court may "handle an obstreperous defendant ...: (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly." [27]

Alaska Rule of Criminal Procedure 38(a) also implements the right to be present as a procedural requirement.[28] But Alaska Rule of Criminal Procedure 38(b)(2) allows a trial to proceed without the defendant "whenever a defendant, initially present ... [e]ngages in conduct which is such as to justify exclusion from the courtroom."

Douglas's briefs do not make it clear whether he is invoking federal or state constitutional principles, but he seems to assume that the standards are the same under either constitution, and that, in any event, *Allen* controls.

*Allen*, of course, governs right-to-be-present claims based on the United States Constitution. We have never before considered whether *Allen* controls right-to-be-present claims grounded in the Alaska Constitution or Criminal Rule 38, i.e., whether to adopt standards *more protective* than those announced in *Allen*. *Allen* sets minimal standards that we must apply whether the defendant relies on the federal or state constitution. Neither party argues that *Allen* does not or should not apply to state constitutional claims, and neither asks

us to apply alternative standards. The court of appeals assumed that *Allen* applies.[29] We therefore assume without deciding that *Allen* also applies to right-to-be-present claims Douglas may base on Alaska law.

In *Allen* the Supreme Court upheld a criminal defendant's exclusion for conduct comparable to Douglas's. Allen "examin[ed] ... juror ... at great length" on matters apparently irrelevant to the juror's qualifications and, when interrupted by the court, "argued with the judge in a most abusive and disrespectful manner." [30] Allen also continued to talk after being asked not to, said to the judge "[w]hen I go out for lunchtime you're going to be a corpse here," and tore his attorney's file and threw papers on the floor.[31] Allen continued to "talk back" to the judge after being warned that he would be removed.[32] After being allowed back into the courtroom, Allen was removed again because he interrupted the proceedings, saying "I'm going to start talking and I'm going to keep on talking all through the trial. There's not going to be no trial like this." [33]

Other courts, also applying *Allen*, have upheld removal for disruptive behavior as or less egregious than Allen's. In *United States v. Nunez*, the trial court removed the defendant from the courtroom after he twice interrupted the prosecutor's examination, once by calling the witness on the stand a liar and another time by "talking in a loud voice and gesturing with his hands." [34] The United States Court of Appeals for the Tenth Circuit, observing that the defendant was given a warning before being removed, held that the district court did not err in removing

---

**26.** *Allen*, 397 U.S. at 343, 90 S.Ct. 1057.

**27.** *Id.* at 343–44, 90 S.Ct. 1057.

**28.** Alaska R.Crim. P. 38(a) ("The defendant shall be present ... at every stage of the trial, ... except as otherwise provided in this rule.").

**29.** *Douglas II*, 166 P.3d 61, 65 (Alaska App.2007) ("The question is whether Judge Thompson abused his discretion under *Allen* and *Rae* [*v. State*, 884 P.2d 163 (Alaska App.1994) (applying *Allen* to state constitutional claims)]....").

**30.** *Allen*, 397 U.S. at 339, 90 S.Ct. 1057.

**31.** *Id.* at 340, 90 S.Ct. 1057.

**32.** *Id.*

**33.** *Id.* at 340–41, 90 S.Ct. 1057.

**34.** *United States v. Nunez*, 877 F.2d 1475, 1476 (10th Cir.1989).

the defendant from the courtroom.[35] In *Chavez v. Pulley,* a habeas case, the district court for the Eastern District of California held that the state trial court did not abuse its discretion when it removed the defendant for "persistently interrupt[ing] the judge despite the latter's warnings concerning his behavior." [36] And in *State v. Chapple,* the Washington Supreme Court held that the trial court did not abuse its discretion when it removed the defendant for "interrupting the proceedings, speaking disrespectfully, and introducing information about his previous trial that might have prejudiced the jury." [37]

Douglas's behavior was no less egregious than that which has been held sufficient to justify exclusion. It appears Judge Thompson was aware as early as November 2003 that, when the verdicts were returned in Douglas's assault case, Douglas spat at the jurors and spectators and said that he hoped they contracted diseases.[38] During pretrial hearings in the witness tampering case, including a hearing on the first day of trial, Douglas frequently interrupted the proceedings, often to argue facts relevant only to the assault case despite Judge Thompson's repeated insistence that the court was unable to help Douglas with that case; he also repeatedly insulted the prosecutor, his own attorneys, and the judge.

"Of course, no action against an unruly defendant is permissible except after he has been fully and fairly informed that his conduct is wrong and intolerable, and warned of the possible consequences of continued misbehavior." [39] Judge Thompson repeatedly and sufficiently warned Douglas that if he continued to engage in disruptive behavior he would no longer be allowed in the courtroom, but his misbehavior continued despite those warnings. Warnings need not be contemporaneous with exclusion to be sufficient to satisfy *Allen's* requirements.[40]

Douglas appears to concede that his behavior at the pretrial hearings justified his initial removal from the courtroom on the first day of trial. But even absent that concession, his behavior was sufficiently egregious to justify his initial exclusion. The competency evaluation indicated that Douglas was able to control himself but chose not to, and that he could be "expected to publicly vent his frustration as a form of protesting his circumstances." The trial court did not abuse its discretion when it excluded Douglas from the courtroom on the first day of trial.

### C. Whether It Was an Abuse of Discretion To Require Douglas To Testify by Speakerphone

The Court in *Allen* stated that "[o]nce lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings." [41] We must therefore determine whether it was an abuse of discretion for the trial court to determine that Douglas was not in fact willing to behave in the courtroom if he were brought back to testify live, and to require Douglas to testify by speakerphone.

We first address two preliminary matters. First, the court of appeals noted that Douglas may not have preserved this claim of error at trial.[42] When Douglas asked to return and the trial court stated that it "[could]n't bring Mr. Douglas in here," Douglas's attorney replied "I'm not asking you to."

**35.** *Id.* at 1476, 1478.

**36.** *Chavez v. Pulley,* 623 F.Supp. 672, 676, 681 (E.D.Cal.1985).

**37.** *State v. Chapple,* 145 Wash.2d 310, 36 P.3d 1025, 1031–32 (2001) (en banc).

**38.** *Douglas II,* 166 P.3d 61, 65 (Alaska App. 2007).

**39.** *Illinois v. Allen,* 397 U.S. 337, 350, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring).

**40.** *See, e.g., United States v. Munn,* 507 F.2d 563, 567 (10th Cir.1974) (holding that *Allen* "does not ... require ... a contemporaneous warning," and a warning that occurred "[s]everal weeks before trial" was sufficient to satisfy *Allen* ).

**41.** *Allen,* 397 U.S. at 343, 90 S.Ct. 1057.

**42.** *Douglas II,* 166 P.3d 61, 80 (Alaska App. 2007).

The court of appeals nonetheless chose to reach the merits of the issue "because of the importance of this issue to future cases." [43] The state does not argue that the issue was not preserved. We therefore assume it was.

Second, Douglas implicitly argues the trial court infringed not only on his right to be present, but also on his privilege to testify in his own defense. The trial court offered Douglas the opportunity to testify telephonically, which he declined.

We apply the *Allen* standards to determine whether a defendant may forfeit his right to testify in person, as well as his right to be present, by engaging in disruptive conduct.[44] It is therefore not necessary for us in this case to distinguish between the right to confront witnesses and the right to testify, although we also note that the right invoked may have a bearing on what measures least restrictively avoid his continued misbehavior.

Douglas argues that because he was excluded from the courtroom as a result of his disruptive behavior, the court was required to allow him to return to the courtroom after he asked to testify in person and promised to behave. The state responds that because of Douglas's actions during the pretrial hearings, the results of his competency evaluation, Judge Thompson's repeated warnings, and the "numerous opportunities that Douglas was afforded to demonstrate his composure," the trial court was not required to allow Douglas to return based "upon Douglas's naked statement that he would behave."

### 1. Whether a trial court must credit a criminal defendant's promise to behave

The court of appeals held that the trial court did not abuse its discretion by refusing to allow Douglas to reenter the courtroom.[45] It distinguished between a "promise" to behave and a demonstrated "willing[ness]" to behave, and held that "a trial judge is not obliged to uncritically accept all promises of future good behavior. If the record affirmatively demonstrates good reasons for not accepting the defendant's promise at face value, the judge does not need to keep giving a disruptive defendant the benefit of the doubt." [46]

Several courts have also held that it was not an abuse of discretion to refuse to allow a defendant to reclaim his right to be present or his privilege to testify based solely on his promise to behave.[47] For example, in *United States v. Munn*, a defendant who was removed from the courtroom at the beginning of jury selection requested to return during that same morning session.[48] The court allowed him to return, but not until trial resumed for the afternoon, at which point the defendant had been absent approximately one hour and fifteen minutes.[49] The Tenth Circuit held that the trial court did not abuse its discretion in declining to return Munn to the courtroom until the afternoon session.[50] It noted that (1) "Munn was able to hear the progress of his trial through a broadcasting system"; (2) "Munn was advised . . . that he

43. *Id.* at 80.

44. *See United States v. Ives*, 504 F.2d 935, 941–42 (9th Cir.1974) (adopting *Allen* standards for determining whether defendant, as result of disruptive conduct, has waived privilege to testify), *vacated on grounds not relevant here sub nom. Ives v. United States*, 421 U.S. 944, 95 S.Ct. 1671, 44 L.Ed.2d 97 (1975), *reinstated in relevant part*, 547 F.2d 1100 (9th Cir.1976); *Chavez v. Pulley*, 623 F.Supp. 672, 681–82 (E.D.Cal.1985) (applying *Allen* standards to privilege to testify).

45. *Douglas II*, 166 P.3d at 83.

46. *Id.* at 81.

47. *United States v. Munn*, 507 F.2d 563, 567–68 (10th Cir.1974); *State v. Jones*, 281 Conn. 613,

916 A.2d 17, 35 (2007) (holding that trial court did not abuse discretion by refusing defendant's request to return after head marshal reported that defendant was behaving in confrontational manner with marshals, appeared agitated, and was unapologetic about previous behavior); *see also United States v. Nunez*, 877 F.2d 1475, 1476–78 (10th Cir.1989). *But see Goston v. State*, 327 Ark. 486, 939 S.W.2d 818, 820–22 (1997) (holding that it was abuse of discretion for trial court to refuse to allow defendant to reclaim his right to be present upon his request to return and promise to behave).

48. *United States v. Munn*, 507 F.2d 563, 567 (10th Cir.1974).

49. *Id.* at 567–68.

50. *Id.* at 568.

would be afforded opportunity to confer with his attorney"; and (3) "Munn was only out of the courtroom something over an hour before he was returned on his promise of good behavior." [51] The court stated that

> [*Allen* is not] an absolute mandate dictating the return of every defendant who has been removed from the courtroom simply on his verbal promise to reform. Prior conduct may indicate such a promise is of little value. Certainly some discretion is still left with a trial court to pass upon the sincerity of a defendant's recantation. [52]

And in *United States v. Ives*, the trial court refused to allow the defendant back into the courtroom to testify after he was removed several times for disruptive behavior. [53] The court did not offer the defendant the choice of testifying telephonically. [54] The United States Court of Appeals for the Ninth Circuit concluded that the trial court did not err in concluding that the defendant lost his right to testify by continuing to engage in disruptive behavior after being warned, removed, and allowed back in. [55]

■ We agree with the Alaska Court of Appeals that "*Allen* does not say that a defendant automatically reclaims the right to be present whenever the defendant *promises* to behave. Rather, *Allen* says that the defendant reclaims the right to be present when the defendant 'is willing' to behave." [56] We hold, as did our court of appeals, that "a trial judge is not obliged to uncritically accept all promises of future good behavior. If the record affirmatively demonstrates good reasons for not accepting the defendant's promise at face value, the judge does not need to keep giving a disruptive defendant the benefit of the doubt." [57]

We also agree that "it would be error to indefinitely bar a defendant from attending their trial or sentencing proceedings based merely upon their past misconduct and the surmise that the disruptive conduct may continue." [58] The court of appeals correctly recognized that defendants "must be allowed to reclaim the right to attend their trial by altering their behavior." [59]

## 2. Whether it was an abuse of discretion for the trial court to discredit Douglas's promise to behave

■ We next consider whether there was good reason for not accepting at face value Douglas's promise to behave. The state notes that the trial court had temporarily excluded Douglas on several occasions, allowing him to return each time, and that Douglas had repeatedly "demonstrated his unwillingness to control himself." The state argues that Douglas's behavior immediately before and after his request to return belied his promise to behave. It asserts that just before promising to "show [himself] calmly" Douglas called the prosecutor and the court "fucking moron[s]." And it contends that after promising that he would behave, Douglas "clearly telegraphed his intention to play by his own rules and relitigate his sexual assault charges" by stating both that he planned to "exhibit proof which my lawyers did not do" and that he had everything "that proves that [K.I.] is a liar." The state concludes that the combination of Douglas's past and immediate behavior was sufficient to support the trial court's determination that Douglas's promise to behave was not credible.

The trial court expressed concern that Douglas would not limit his testimony to relevant matters on direct examination or meaningfully answer the prosecutor's ques-

51.  *Id.* at 567–68.

52.  *Id.* at 568.

53.  *United States v. Ives*, 504 F.2d 935, 943–45 (9th Cir.1974), *vacated on grounds not relevant here sub nom. Ives v. United States*, 421 U.S. 944, 95 S.Ct. 1671, 44 L.Ed.2d 97 (1975), *reinstated in relevant part*, 547 F.2d 1100 (9th Cir. 1976).

54.  *Ives*, 504 F.2d at 944–45.

55.  *Id.* at 946.

56.  *Douglas II*, 166 P.3d 61, 81 (Alaska App.2007) (emphasis in original).

57.  *Id.*

58.  *Id.* at 80–81.

59.  *Id.* at 81.

tions on cross-examination, and that he would "curs[e] and carry[ ] on" if interrupted. It predicted that Douglas would not answer the state's questions "except with invective and insults" and that Douglas's conduct would leave the jury "hopelessly prejudiced against" Douglas. And it stated that it did not wish to be presented with the possibility of striking Douglas's testimony or declaring a mistrial.

We agree with the state and the court of appeals that the trial court did not abuse its discretion when it concluded that Douglas's promise to behave was not credible and therefore refused to allow Douglas to return to the courtroom to testify.[60] Any determination of credibility will necessarily be based on a defendant's past behavior. If previous misbehavior is sufficiently severe and recent to render a promise to behave not credible, *Allen* does not mandate that a defendant be given yet another opportunity to misbehave, this time in front of the jury.

The dissenting opinion does not say how many chances Douglas should have been given and seems to posit a "one-bite" rule that allows every defendant who promises to behave at least one opportunity to act out in front of the jury, irrespective of the recency and severity of pretrial misbehavior or the lack of credibility of the defendant's promise. The dissenting opinion says that "Douglas was not given even a single opportunity to appear before the jury upon his promise to behave."[61] This contention seems to assume that the trial court was bound to credit Douglas's promise. It was not.

Douglas was disruptive and disrespectful during both the final status and pretrial evidentiary hearings on the eve of trial, and he continued to misbehave immediately before and after Judge Thompson denied his request to return. He also insisted at those hearings that he intended to relitigate the first trial's assault charges and K.I.'s credibility. Given Douglas's pattern of misbehavior and insistence on attempting to offer

irrelevant and inadmissible evidence, Judge Thompson could permissibly find that Douglas's promise to behave was not credible.

We assume the trial court must inform a defendant he can return to court if he behaves.[62] But any failure to explicitly so advise Douglas during the trial or the final pretrial hearings did not prevent Douglas from asking that he be returned to the courtroom. He vigorously demanded to be returned.

We also assume a trial judge considering such a request must give de novo consideration to the defendant's current promises or contentions, and may not simply decline to reconsider an earlier exclusion order.[63] But this does not mean the trial court must consider the current promises or representations in a contextual vacuum. The court here justifiably took into account what Douglas had long been saying; there was no sign Douglas had mellowed and would behave even if thwarted on direct or provoked on cross, and there was no evidence that Douglas had in fact changed his tune and that his promise to behave was credible.

There was ample evidence, personally witnessed by the trial court, that permitted the trial court to make a reasoned decision that Douglas was not in fact willing or able to behave himself while testifying. As the state argues, Douglas had reacted badly in the past "to being told that he could not discuss certain matters pertaining to the sexual assault case": when Douglas was asked to be quiet or not to use abusive names such as "vile pig-face man" and "fat ass" to refer to others in the courtroom, "he responded with angry, uncontrolled outbursts and was wholly undeterred by any form of warning."

We also agree with the state that Douglas had been temporarily excluded on several occasions, and had demonstrated an unwillingness to control himself when he was returned to the courtroom. Judge Thompson's

---

**60.** *Id.* at 83.

**61.** Op. at 331.

**62.** *See State v. Strich*, 99 Conn.App. 611, 915 A.2d 891, 898–900 (2007) (holding that although

court erred in failing to inform defendant that he could reclaim right to be present, error was harmless).

**63.** *See Douglas II*, 166 P.3d at 80–81.

willingness to allow Douglas back into the courtroom on these occasions implies that Judge Thompson did not remove Douglas because he was personally offended by Douglas's behavior. Rather, it gives credence to Judge Thompson's explanation that he excluded Douglas from the trial because of the likelihood that Douglas would disrupt the proceedings and prejudice himself.

The state and court of appeals correctly note that Douglas's own attorney was convinced Douglas would be unable to behave if "cross-examined in a way that made him feel uncomfortable" or "admonished by the judge to confine his remarks to pertinent subjects and admissible evidence." [64] Indeed, Douglas himself on more than one occasion stated to Judge Thompson that he could not control himself. As the court of appeals noted:

> On several occasions, when Judge Thompson or Douglas's own attorney admonished him to keep quiet and stop giving speeches, Douglas replied that he *could not* do so. For instance, at the March 2nd pre-trial hearing, Douglas aimed invective at the prosecutor. When Judge Thompson told Douglas to stop, Douglas replied that it was impossible—and he then accused the prosecutor of subverting justice:
>
> > *The Court:* Mr. Douglas, you're going to have to control yourself.
> >
> > *Douglas*: I can't. This guy stole my evidence. He ...
> >
> > . . . .
>
> A similar colloquy—*i.e.*, another protestation by Douglas that it was impossible for him to remain silent—took place at the motion hearing on June 14th:
>
> > *Defense Counsel:* Listen, you (indiscernible—simultaneous speech).
> >
> > *Douglas:* Excuse me. I can't take this. He [ *i.e.*, the prosecutor] is a liar.
> >
> > *Defense Counsel:* You need to just sit and keep quiet.

> *The Court:* Try to take ...
>
> *Douglas:* Pig-eyed liar. He's going to hell. . . . [To the prosecutor] You're going to be swimming with [K.I.] in the lake of fire, you fucking fat pig. That's what I meant by going swimming, you pig-faced bastard.
>
> *The Court:* Well. Let me note that ... one reason I had Mr. Douglas brought [to the courthouse] today, instead of doing this by phone, was just to see if there had been any ...
>
> *Douglas:* Well, I just can't sit here and listen to lies, Your Honor.[65]

Finally, we agree with the state that Douglas's contemporaneous behavior on September 1, 2004—calling the prosecutor and judge "fucking moron[s]" and insisting on discussing evidence that was relevant only to his assault case—belied his promise to behave.

### 3. The danger the trial court might have to declare a mistrial

We assume that the court of appeals was correct in supposing that Douglas's promise to behave might have been sufficient to warrant his return to the courtroom "if the sole danger to the orderliness of the proceedings had been Douglas's history of physically assaultive conduct." [66] Courtroom measures, such as inconspicuous restraints or physical separation, might have fully ameliorated that risk. But that was not the only risk he posed; the trial court was also justifiably concerned about the prejudicial impact on the jury of Douglas's verbal behavior, and also the danger the trial court might have to declare a mistrial.

Many courts have held that "misconduct or disruptive behavior on the part of a defendant during the course of a criminal trial will not establish grounds for his obtaining a mistrial." [67] And both trial and appellate

---

64. *Id.*

65. *Id.* at 82 (alterations and italics in original, underline added).

66. *Id.* at 83.

67. *State v. Linkous,* 177 W.Va. 621, 355 S.E.2d 410, 413 (1987) (holding that refusal to grant mistrial after several members of jury saw defendant engage in disruptive behavior that resulted in scuffle with law enforcement officials at trial was not abuse of discretion); *see also, e.g., Gordon v. State,* 609 N.E.2d 1085, 1087 (Ind.1993) (holding that defendant was not entitled to mistrial on basis of his outburst and subsequent shackling); *State v. Shank,* 448 So.2d 654, 657

courts are understandably reluctant to reward a misbehaving defendant with a self-inflicted mistrial. But we have held that "there are instances of serious misconduct on the part of an accused ..., which make permissible both the granting of a mistrial and reprosecution," [68] and we assume that Judge Thompson was aware of that holding. And some courts have granted mistrials on the basis of prejudice stemming from a defendant's own misconduct.[69]

Although we would not in most cases consider a defendant's own misconduct grounds for a mistrial, we decline to hold categorically that a defendant altogether waives his right to a fair trial if he prejudices himself by misbehaving in front of the jury. A trial court may feel obligated to grant a mistrial, either on the defendant's motion or sua sponte, even if it is the defendant's own misbehavior that potentially prejudices the jury.

The trial court therefore expressed a valid concern that it might have to declare a mistrial if it allowed Douglas to reenter the courtroom to testify.[70] Even Douglas's own trial attorney implied that he believed Douglas was likely to misbehave in front of the jury if Douglas was permitted to reenter the courtroom. If that occurred, the trial court would have been faced with the possibility of having to decide whether to declare a mistrial.

Had Douglas misbehaved in front of the jury and then moved for a mistrial, the trial court would have had to decide whether to grant or deny the motion. Either granting or denying such a motion would have burdened jurors, defense counsel, prosecutors, and the court system. Granting would have allowed Douglas, by virtue of his own misbehavior, to delay the verdict and impose the cost of reprosecution on the entire justice system. Denying would have required review by the court of appeals, at least, imposing additional burdens on the justice system and perhaps requiring a retrial if the denial were reversed on review.

■ Even if Douglas would not have moved for a mistrial, the trial court would have been in a no-less-difficult position. A trial court may only grant a mistrial sua sponte for manifest necessity.[71] Once jeopardy has attached—after the jury has been sworn—a defendant may not be retried for the same offense unless he has consented to a mistrial or there was manifest necessity for granting a mistrial.[72] The manifest necessity standard requires a high degree of necessity such that "the ends of public justice would not be served by a continuation of the proceedings." [73]

If the trial court were to fail to grant a mistrial sua sponte, a defendant might appeal the failure on the ground his constitutional right to a fair trial was denied, or request postconviction relief on the ground his attor-

---

(La.1984) (holding that defendant who was prejudiced because of his own speech and conduct, including admissions of guilt before jury, threats to kill jury, and attempt to strangle his defense counsel, was not entitled to new trial); *State v. Solomon*, 7 S.W.3d 421, 427 (Mo.App.1999) (holding that defendant's forcible removal from courtroom in presence of jury did not warrant declaring a mistrial).

**68.** *Lewis v. State*, 452 P.2d 892, 897 (Alaska 1969).

**69.** *See, e.g., Braswell v. United States*, 200 F.2d 597, 602 (5th Cir.1952) (stating that "[d]enial of a fair trial is beyond the range of [permissible] punishment" for misbehavior, and holding that mistrial should have been granted after defendant struck marshal in presence of jury).

**70.** *See, e.g., United States v. Ives*, 504 F.2d 935, 945 (9th Cir.1974) ("The judge, out of the pres-

ence of the jury, accurately described the dilemma before him: If he refused to allow Ives to testify, his counsel would charge that the court erred by denying him that privilege; if he allowed Ives to testify and Ives acted as the judge believed he would, his counsel would charge that the court erred by not granting a mistrial."), *vacated on grounds not relevant here sub nom. Ives v. United States*, 421 U.S. 944, 95 S.Ct. 1671, 44 L.Ed.2d 97 (1975), *reinstated in relevant part*, 547 F.2d 1100 (9th Cir.1976).

**71.** *Koehler v. State*, 519 P.2d 442, 448 (Alaska 1974).

**72.** *Arizona v. Washington*, 434 U.S. 497, 505, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978); *Koehler*, 519 P.2d at 448.

**73.** *United States v. Jorn*, 400 U.S. 470, 485, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971); *see also Muller v. State*, 478 P.2d 822, 826–27 (Alaska 1971).

ney was ineffective for failing to move for a mistrial.[74] Litigation of either issue, whatever the outcome, would cause further delay and increase expense to the justice system.

A trial court faced with the difficult choice of granting or denying a mistrial sua sponte might well grant the mistrial, choosing to strike the balance in favor of protecting the defendant's right to a fair trial. But if an appellate court were to hold that manifest necessity did not exist, the state would be unable to reprosecute the defendant.[75] By misbehaving, the defendant could not only delay the proceedings and waste resources, but might even avoid reprosecution. We decline to encourage such a result.

These concerns confirm a trial court's need for broad discretion in determining how best to avoid a mistrial while protecting the rights of the misbehaving defendant to the extent possible. Allowing a defendant repeated opportunities to reclaim his right to be present or his right to testify may be desirable, but it is not categorically required by *Allen*. Nor does the Supreme Court categorically require a trial court to give a defendant who has misbehaved egregiously outside the jury's presence an opportunity to misbehave in front of the jury at least once before being permanently removed.

#### 4. The trial court's efforts to protect Douglas's constitutional rights

■ We also think it significant that the trial court did not altogether prevent Douglas from testifying. The dissenting opinion correctly notes our theoretical preference for live testimony when possible, but it underestimates the potential prejudice and disruption that would result from in-person, as opposed to telephonic, misbehavior.[76] Testifying by speakerphone would have allowed Douglas to convey his version of relevant facts, and would have allowed the court to carefully monitor Douglas's testimony and turn off outbursts to avoid prejudice or until decorum could be restored. In contrast, live

misconduct in the jury's presence could have been stopped only by removing Douglas from the jury's presence or removing the jury from Douglas's presence. Either of those remedies would have allowed Douglas to continue to misbehave in the jury's immediate presence for some minutes before he, or the jury, could be removed from the courtroom. Having a disruptive defendant testify by speakerphone—particularly if the court imposes a brief electronic delay so it can interrupt the testimony in time to prevent the jury from hearing irrelevant, disruptive, or prejudicial testimony—would drastically reduce any prejudice and disruption resulting from misbehavior.

But Douglas declined to take advantage of the court's willingness to let him testify by speakerphone. The opportunity to testify by speakerphone and the court's continued willingness to allow Douglas to address (and abuse) the court outside the jury's presence also helps persuade us that Judge Thompson did not act prematurely or precipitously for any offense to the court's personal sensibilities. Had Douglas made a credible promise to behave, the record convinces us that the trial court would have allowed Douglas to testify in person.

Under different circumstances we might find that it was an abuse of discretion to refuse to allow a defendant back into the courtroom to testify. But here Douglas continued to misbehave in court even on the day before trial and on the first day of trial, and Judge Thompson found that Douglas was not willing to behave. If a defendant's misbehavior were limited to the more distant past, it might be sufficiently attenuated for *Allen* to mandate that he be allowed another chance to reclaim his right to be present. Similarly, we might find abuse of discretion if a recently misbehaving defendant demonstrated—by his own behavior or the representations of a third person, such as his attorney—a credible change of heart and

---

**74.** *See, e.g., Hardwick v. Dugger,* 648 So.2d 100, 104–05 (Fla.1994) (considering, although ultimately rejecting for lack of prejudice, postconviction claim that trial counsel was ineffective for failing to move for mistrial after emotional outburst of victim's family member).

**75.** *Koehler,* 519 P.2d at 448.

**76.** Op. at 331.

willingness to behave. In that situation it might be unreasonable for the trial court to rely even on a defendant's recent past behavior to determine that his promise was not credible. But that is not the situation here. Nothing in Douglas's words or in his recent or past conduct demonstrates that it was an abuse of discretion to decline to return him to the courtroom one more time.

We commend Judge Thompson for his handling of this case. We are impressed that during a number of hearings over an extended period of time Judge Thompson, in the Supreme Court's words, "at all times conducted himself with that dignity, decorum, and patience that befit a judge," even in the face of "scurrilous, abusive language and conduct."[77] He had many opportunities to observe Douglas's behavior and repeatedly attempted to cajole Douglas into behaving so that Douglas could be present in the courtroom during his trial. Judge Thompson excluded Douglas only as a last resort and made the speakerphone remedy available. The fact that Judge Thompson tried so hard to avoid excluding Douglas confirms that Douglas indeed carried the keys to the courtroom in his pocket but obstinately refused to use them, and that exclusion was not only permissible but likely unavoidable.

## IV. CONCLUSION

The court of appeals' opinion affirming Douglas's conviction is AFFIRMED.

FABE, Chief Justice, with whom MATTHEWS, Justice, joins, dissenting.

FABE, Chief Justice, with whom MATTHEWS, Justice, joins, dissenting.

Today the court affirms Ty Douglas's conviction despite the fact that he was barred from attending his own trial and denied the opportunity to testify in person on his own behalf. Although it is certainly true that Douglas had been disruptive in the courtroom in the past, the trial court failed to give him a single opportunity to honor his promise to behave appropriately in front of the jury. Because the law demands that more respect be given to a defendant's right to attend his trial, and in particular to give live testimony if he so chooses, I would reverse Douglas's conviction.

As the court recognizes, a defendant's right to attend his trial "is rooted in the right to confront adverse witnesses and the right to due process of law" under both the United States and Alaska constitutions.[1] The Supreme Court of the United States has said that "the accused's right to be present in the courtroom at every stage of his trial" is "[o]ne of the most basic of the rights guaranteed by the Confrontation Clause."[2] In recent years the Supreme Court has steadfastly refused to "relax the requirements of the Confrontation Clause to accommodate the necessities of trial and the adversary process,"[3] stressing that "there is something deep in human nature that regards face-to-face confrontation between accused and accuser as essential to a fair trial in a criminal prosecution."[4] And we ourselves have noted

77. *Illinois v. Allen*, 397 U.S. 337, 347, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).

1. Op. at 319 (footnotes omitted).

2. *Illinois v. Allen*, 397 U.S. 337, 338, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).

3. *Melendez–Diaz v. Massachusetts*, —— U.S. ——, 129 S.Ct. 2527, 2541, 174 L.Ed.2d 314 (2009) (internal quotation marks omitted) (holding that Confrontation Clause bars admission of certificates of drug analysis sworn by analysts at state laboratory without requiring their in-court testimony).

4. *Coy v. Iowa*, 487 U.S. 1012, 1017, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988) (internal quotation marks omitted) (holding that placement of screen between defendant and child sexual assault vic-

tims during testimony against defendant violated defendant's Confrontation Clause rights); *see also Giles v. California*, —— U.S. ——, 128 S.Ct. 2678, 2692–93, 171 L.Ed.2d 488 (2008) (holding that California Supreme Court's theory of "forfeiture by wrongdoing" was not an exception to confrontation requirement and noting that "the guarantee of confrontation is no guarantee at all if it is subject to whatever exceptions courts from time to time consider 'fair' "); *Davis v. Washington*, 547 U.S. 813, 821–22, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (holding that Confrontation Clause bars admission of a statement taken by a police officer in the course of interrogation where "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution" and the witness does not appear at trial); *Crawford v. Washington*, 541 U.S. 36, 53–54, 124 S.Ct. 1354,

that "the defendant's presence at all stages of the trial ... promotes the perception and reality of fairness in the trial process."[5] Because such an important and deeply rooted right should not be abridged lightly, any limitations placed on a criminal defendant's ability to attend his trial in person should be no more restrictive than is necessary to accomplish the purpose they serve.[6]

In *Illinois v. Allen* the Supreme Court grappled with the question of what a trial judge can do to reduce the disruption caused by an unruly defendant like Douglas without running afoul of his constitutional right to be present during his trial.[7] As the court acknowledges today, "*Allen* sets minimal standards that we must apply whether the defendant relies on the federal or state constitution."[8] The treatment of Douglas failed to meet the minimal federal standards set by *Allen*.

Under *Allen*, one constitutionally permissible method of controlling a disruptive defendant is to exclude him from the courtroom "until he promises to conduct himself properly."[9] The *Allen* Court stressed that "the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings."[10] After being removed once, the defendant in *Allen* was permitted to reenter the courtroom upon his request to do so and a warning that he would be removed again if he did not behave.[11] After acting out and being removed a second time, the trial judge "reiterated his promise to Allen that he could return to the courtroom whenever he agreed to conduct himself properly" and once Allen "gave some assurances of proper conduct" he "was permitted to be present throughout the remainder of the trial."[12] The *Allen* Court favorably noted the fact that the trial judge "*constantly informed* [Allen] that he could return to the trial when he would agree to conduct himself in an orderly manner."[13]

Excluding an unruly defendant from the courtroom as described in *Allen* is analogous to holding an obstinate individual in civil contempt of court. As is the case with civil contempt, the purpose of the exclusion is remedial, rather than punitive—the defendant is excluded not to punish him for his outbursts, but to ensure an orderly trial.[14] And just as a civil contempt defendant "carries the keys to his or her imprisonment (or punishment) in his or her own pocket,"[15] *Allen* requires that a defendant excluded from his trial be given the means to redeem himself and regain his right to be present in the courtroom. Though Douglas's pretrial antics were sufficiently inappropriate to justify his initial exclusion, he was never given the "keys" to his metaphorical cell.

158 L.Ed.2d 177 (2004) (holding that Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination").

**5.** *Raphael v. State*, 994 P.2d 1004, 1012 (Alaska 2000).

**6.** *Cf. State v. Murtagh*, 169 P.3d 602, 608, 610 (Alaska 2007) (explaining that "[s]tate practices, including statutes, that interfere with fair trial rights do not pass constitutional muster merely because they are minimally rational," but rather "we will consider not only the relative strength of the purpose underlying the statute but also the likelihood that the statute will achieve its purpose and whether the purpose can be achieved in another way that does not impede fair trial rights").

**7.** 397 U.S. at 342–47, 90 S.Ct. 1057.

**8.** Op. at 320.

**9.** 397 U.S. at 343–44, 90 S.Ct. 1057.

**10.** *Id.* at 343, 90 S.Ct. 1057.

**11.** *Id.* at 340, 90 S.Ct. 1057.

**12.** *Id.* at 341, 90 S.Ct. 1057.

**13.** *Id.* at 346, 90 S.Ct. 1057 (emphasis added).

**14.** *See Stadler v. State*, 813 P.2d 270, 272 (Alaska 1991) ("If it is for civil contempt the punishment is remedial.... But if it is for criminal contempt the sentence is punitive....").

**15.** *Id.; see also Diggs v. Diggs*, 663 P.2d 950, 951 (Alaska 1983) ("[A]ny sanction which is imposed as a result of the civil contempt proceeding must afford a continuous opportunity to the defendant to purge the contempt.").

After being barred from the courtroom due to his misbehavior, Douglas asked to be allowed back in and promised to "show [him]self calmly." But the superior court did not allow Douglas even a single opportunity to reenter, and once the trial began it did not inform Douglas of anything he could do to reclaim his right to be present. In fact, the superior court repeatedly and unequivocally expressed its unwillingness to even consider allowing Douglas into the courtroom: "I don't have any intention of bringing Mr. Douglas into the courtroom while the jury is in the courtroom," "[i]t just ain't going to happen," "I'm not going to bring him in here," and "I can't bring Mr. Douglas in here."[16]

The court recognizes that under *Allen* "defendants must be allowed to reclaim the right to attend their trial by altering their behavior"[17] and that "it would be error to indefinitely bar a defendant from attending their trial or sentencing proceedings based merely upon their past misconduct and the surmise that the disruptive conduct may continue."[18] Yet the court nonetheless affirms Douglas's conviction despite the fact that he *was* "indefinitely" barred from his trial without ever once being "allowed to reclaim the right to attend." The court reaches this result by drawing a fine distinction between a defendant who "promises" to behave and a defendant who is "willing" to behave, concluding that although Douglas promised to conduct himself properly, he was not truly "willing" to do so.[19] I do not believe that *Allen* allows such a fine distinction to be drawn—in my view, *Allen* requires a trial court to at least provisionally honor a defendant's promise to behave even when his behavior has been as egregious as Douglas's.

But even if *Allen* does allow some promises to be disregarded, Douglas's promise to behave demonstrated sufficient self-awareness and understanding of the importance of making a good impression on the *jury* (if not on the judge and attorneys) to merit at least a single chance to regain his right to attend his trial. Although, as highlighted by the court, Douglas expressed an unwillingness to behave during pretrial proceedings in the absence of the jury, he nonetheless unequivocally stated his intent to remain calm in the presence of the jury, recognizing that the jury would be deciding his fate. Douglas pointed out to the trial court that he "didn't act up in front of the jury [during his prior trial] until after the verdict" and that he "sat there through the whole trial." He explained, "I didn't want to mess up in front of the [prior] jury and I don't want to mess up in front of this jury," "I'm not going to sabotage myself in front of the jury," "[t]here's no reason for me to get upset in front of that jury," and "I don't want to make those people upset." He also showed self-awareness regarding his misbehavior when he stated that although he could "show [him]self calmly" to the jury during the trial, the court shouldn't "bring [him] back in there for the reading of the verdict" because if found guilty he would "be upset" and might act out.

Several jurisdictions have held that a trial court abused its discretion in refusing to allow a defendant to reenter upon a request to return and promise to behave. For example, in *Goston v. State*, the Arkansas Supreme Court held that although "the trial court's knowledge of a defendant's past behavior is a relevant consideration,"[20] the trial court abused its discretion because "Goston was never afforded *any* opportunity to reclaim his right of confrontation" despite requests to return and promises to behave.[21] And in *State v. Aceto*, the Montana Supreme Court held that the trial court erred when it

---

16. The superior court also indicated a predisposition to exclude Douglas prior to trial, warning Douglas: "I'm not nearly as indulgent as Judge Weeks" and "if you were to get about two words out of line with me, I think you'd probably be listening in on the speakerphone and I don't think ... the microphone will be working either."

17. Op. at 323 (internal quotation marks omitted).

18. *Id.* (internal quotation marks omitted).

19. *Id.* at 323–24.

20. 327 Ark. 486, 939 S.W.2d 818, 820 (1997).

21. *Id.* at 821–22.

did not give the defendant a chance to return to the courtroom when he apologized after repeated bad behavior.[22]

Some jurisdictions have gone even further, interpreting *Allen* to require a trial court to affirmatively offer a defendant the opportunity to reclaim his right to be present.[23] The American Bar Association's Standards for Criminal Justice similarly recommend that a "removed defendant should be afforded an opportunity to hear the proceedings and, at appropriate intervals, be offered on the record an opportunity to return to the courtroom upon assurance of good behavior." [24]

Although several decisions have upheld the permanent exclusion of a disruptive defendant from his trial, in some of these cases the defendant failed to request to return or promise to behave,[25] and in others, the defendant was allowed to return multiple times upon repeated promises to behave, before finally being excluded permanently.[26] Douglas's case does not require us to decide precisely how many chances a defendant must be given before he is barred from his trial

indefinitely because Douglas was not given even a single opportunity to appear before the jury upon his promise to behave.

Even if it were possible to justify excluding Douglas from the bulk of his trial, it is particularly troubling that Douglas was not given a chance to testify in person on his own behalf. In a context much less weighty than a felony trial—a simple driver's license revocation hearing—we have recognized the special importance of live, as opposed to telephonic, testimony.[27] We noted that "the potential for empathy and nuanced understanding is much greater in person-to-person communications than in any of the various forms of telecommunicating," and thus that "when a party is denied an in-person hearing before a trier of fact, there is a risk that the party will be less able to convey the message that his story is the truth." [28]

Concerns about the difficulty of controlling Douglas's testimony do not serve as a persuasive rationale for denying him the right to testify in person given that he was offered the opportunity to testify by speaker phone

**22.** 323 Mont. 24, 100 P.3d 629, 630–31, 638–39 (2004).

**23.** *Chavez v. Pulley*, 623 F.Supp. 672, 681–82 (E.D.Cal.1985) ("[A] trial judge who has removed a criminal defendant from the courtroom because of his disruptive behavior must offer the defendant the opportunity to reclaim the right of presence and the privilege to testify."); *State v. Strich*, 99 Conn.App. 611, 915 A.2d 891, 899–900 (2007) (holding that the trial court erred because it "never informed the defendant that, with proper assurances, he could reclaim his right to be present for the remaining courtroom proceedings" but that the error was harmless).

**24.** ABA Standards for Criminal Justice: Special Functions of the Trial Judge, Standard 6–3.8 (3d ed.2000).

**25.** *People v. Pearson*, 52 Ill.2d 260, 287 N.E.2d 715, 719 (1972) ("[T]he defendant did not ask to be allowed to resume his place in the courtroom and, of course, he did not 'promise to conduct himself properly' following the second disturbance."); *State v. Sahakian*, 886 S.W.2d 178, 181 (Mo.App.1994) (stating that after removal "[d]efendant did not express any desire to participate in the three day trial"); *Dotson v. State*, 785 S.W.2d 848, 854 (Tex.App.1990) (holding no abuse of discretion where trial judge removed defendant from courtroom, defendant did not request to return, and trial judge did not subsequently inquire as to whether defendant would

behave if permitted to return); *State v. Chapple*, 145 Wash.2d 310, 36 P.3d 1025, 1033 (2001) (en banc) (stating that "lower courts have interpreted [the right to reclamation] to require varying degrees of trial court involvement in the reclamation" and holding that using defense counsel as go-between was adequate to give defendant opportunity to reclaim right).

**26.** *United States v. Nunez*, 877 F.2d 1475, 1476–78 (10th Cir.1989) (holding that it was not error to refuse to allow defendant to return for third time, after having removed him twice and excused him once, allowing him to return twice upon promises to behave); *People v. Medina*, 11 Cal.4th 694, 47 Cal.Rptr.2d 165, 906 P.2d 2, 26 (1995) (rejecting defendant's argument that trial court erred in refusing to allow defendant to return for sixth time, after having removed him six times, allowing him to return five times upon promises to behave); *State v. Gillam*, 629 N.W.2d 440, 451–52 (Minn.2001) (holding that it was not abuse of discretion to refuse to allow defendant to return for third time, after having removed him three times, allowing him to return twice upon promises to behave).

**27.** *Whitesides v. State, Dep't of Pub. Safety, Div. of Motor Vehicles*, 20 P.3d 1130, 1136–37 (Alaska 2001).

**28.** *Id.* at 1137.

and his speaker phone testimony could likewise have been uncontrollable. Flipping a switch to suppress acting out on a speaker phone seems only marginally less prejudicial than calling a recess, excusing the jury, and removing the defendant from the courtroom. And to the extent that calling a recess would be more prejudicial, such a problem would have been invited by the defendant.

The court overstates the risk of mistrial raised by a possible outburst by Douglas in front of the jury, whether during his own testimony or at another stage in the proceedings. As the court recognizes, a defendant's own misconduct is generally not considered grounds for a mistrial—to hold otherwise would give many defendants a strong incentive to misbehave.[29] Thus, provided a defendant has been sufficiently warned that any disruption he voluntarily causes will not result in a mistrial, the risk of prejudicing himself in front of the jury should be his to take if he so chooses.[30] We should not countenance the total denial of a defendant's right to attend his trial and give in-person testimony in the name of preserving other fair trial rights of the defendant. The choice is for the defendant.

Because, by excluding Douglas from his entire trial and refusing to let him testify in person, the trial court violated the confrontation and due process clauses of the United States and Alaska constitutions, I respectfully dissent.

---

**29.** Op. at 325–26.

**30.** The right to testify is personal to the defendant, and the defendant may exercise it even if doing so is against his counsel's wishes and against his own best interests. *See LaVigne v. State,* 812 P.2d 217, 219 (Alaska 1991) (explaining that "[t]he constitutional right to testify is both personal to the criminal defendant and fundamental to the dignity and fairness of the judicial process" and that "[t]he ultimate decision whether to exercise the right therefore rests with the defendant, not with defendant's counsel"); *cf. Faretta v. California,* 422 U.S. 806, 833–36, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (holding that criminal defendants have the constitutional right to defend themselves pro se because although "in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts," "[t]he right to defend is personal" and the drafters of the Bill of Rights "understood the inestimable worth of free choice").