Leroy STANSBERRY, Appellant,

v.

STATE of Alaska, Appellee.

No. A–10398.

Court of Appeals of Alaska.

May 4, 2012.

**580**

Brooke V. Berens, Assistant Public Advocate, Appeals & Statewide Defense Section, and Rachel Levitt, Public Advocate, Anchorage, for the Appellant.

Timothy W. Terrell, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and John J. Burns, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

*OPINION*

MANNHEIMER, Judge.

Leroy Stansberry was charged with multiple counts of first-degree sexual assault, kidnapping, and second-degree sexual abuse of a minor involving five separate victims over the course of several years. Because of Stansberry's disruptive behavior throughout the proceedings (both in pre-trial hearings and at the trial itself), Superior Court Judge Philip R. Volland finally ordered that Stansberry be removed from the courtroom. Stansberry was not present during much of his jury trial.

Judge Volland allowed Stansberry to return to the courtroom during the defense case, when Stansberry testified on his own behalf. And because Stansberry behaved himself during his testimony, Judge Volland told Stansberry that he was welcome to stay in the courtroom during the remainder of the trial. However, during the prosecutor's summation to the jury, Stansberry interrupted and asserted that the prosecutor was offering the jury "fantasies" and "false allegations". When Judge Volland interceded and asked Stansberry if he was willing to resume proper behavior, Stansberry told the judge that he wished to leave the courtroom because "[he could not] sit there and [take] that humiliation". Stansberry was removed from the courtroom, and he was not present for the remainder of his trial.

The three questions presented in this appeal are: (1) whether Stansberry's behavior warranted his removal from the courtroom, (2) whether Judge Volland adequately warned Stansberry that his disruptive behavior might lead to his removal from the courtroom, and (3) whether Judge Volland adequately informed Stansberry that he would be allowed to return if he ceased his disruptive behavior.

For the reasons explained in this opinion, we conclude that the answer to all of these questions is "yes", and we therefore affirm Stansberry's convictions.

*The governing law*

A criminal defendant has a constitutional right to personally attend the court proceedings in their case, but a defendant can forfeit that right if the defendant proves incapable of controlling their disruptive behavior even after they have been admonished and unambiguously warned that continued disruption will result in their removal from the courtroom. *Douglas v. State (Douglas I)*,166 P.3d 61, 64–65 (Alaska App.2007), and *Douglas v. State (Douglas II )*, 214 P.3d 312, 319–320 (Alaska 2009).

As our supreme court explained in *Douglas II,*

> The right of a criminal defendant to be present at every stage of trial is rooted in the right to confront adverse witnesses and the right to due process of law. But ... the right to be present at trial is not absolute. In [*Illinois v.*] *Allen,* [397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970),] the Supreme Court held that although "courts must indulge every reasonable pre-

sumption against the loss of constitutional rights," a defendant may forfeit the right to be present at trial if[,] "after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." [*Allen*, 397 U.S. at 343, 90 S.Ct. at 1060–61]

*Douglas II*, 214 P.3d at 319–320 (footnotes omitted).

With regard to the type of warnings that a defendant must receive before a judge can justifiably remove a defendant from the courtroom, the warnings must "fully and fairly [inform the defendant] that his conduct is wrong and intolerable", and the warnings must also apprise the defendant that removal from the courtroom is a possible consequence of continued misbehavior. *Douglas II*, 214 P.3d at 321. However, the law does not require that these warnings immediately precede, or be contemporaneous with, the defendant's removal from the courtroom. Rather, the judge may rely on previous warnings, if those warnings satisfied the criteria described in the first sentence of this paragraph. *Ibid.*

Finally, when an appellate court reviews a judge's decision to remove a defendant from the courtroom, that decision is reviewed under the "abuse of discretion" standard. *Douglas II*, 214 P.3d at 319. This is because the trial judge "is in the best position to assess how disruptive a defendant's behavior is[,] and how likely it is to continue." *Ibid.* Under this "abuse of discretion" standard of review, an appellate court will uphold the trial judge's decision unless that decision is "arbitrary, capricious, manifestly unreasonable, or stems from an improper motive". *Ibid.*

### Underlying facts

In 2003, a Palmer grand jury indicted Stansberry on four counts of first-degree sexual assault involving two victims. Three months later, the grand jury returned a supplemental indictment charging Stansberry with ten additional charges involving three additional victims. These charges included first-degree sexual assault, attempted first-degree sexual assault, second-degree sexual abuse of a minor, and kidnapping.

Stansberry initially chose to represent himself. Shortly after the grand jury issued its supplemental indictment, Stansberry filed a motion seeking dismissal of the charges. In his supporting affidavit, Stansberry accused the State of prosecuting him "under the wrong identity". In his motion, Stansberry declared:

I am holding the State [and] the prosecutor ... responsible for brainwashing me, mental destroyment [of] my character and identity. I am holding them [responsible,] along with the Anchorage Police Dept., [the] State Troopers, and the [Division] of Motor Vehicles[,] for wrongful identification and putting my life in danger.... I have no other choice but to ask for punitive damages.

Because of the content of some of Stansberry's pleadings, as well as Stansberry's unusual conduct during the pre-trial proceedings in this case, the State asked Superior Court Judge Beverly W. Cutler to order an evaluation of Stansberry's mental competence. In support of that request, the State informed Judge Cutler of Stansberry's earlier behavior in a separate Anchorage criminal case. According to the State, Stansberry accused the Anchorage trial judge of perjury and forgery, and Stansberry repeatedly presented legal arguments to the jury, despite the trial judge's warning that he could not ask the jury to resolve issues of law.

Action on the State's request for a competency evaluation was deferred when Stansberry decided to stop representing himself and instead requested court-appointed counsel. However, over the next year and a half, even though Stansberry was represented by counsel, he submitted a variety of *pro se* pleadings, including repeated requests for release on his own recognizance, and a petition for writ of habeas corpus in the federal district court. The named defendants in this federal habeas petition included the Alaska Court System, Judge Cutler, the Anchorage trial judge, the prosecuting attorney, and

Stansberry's own court-appointed counsel. As we are about to explain, Stansberry repeatedly asserted that the existence of this federal litigation deprived the superior court of any jurisdiction over the criminal charges pending against him.

In January 2006, the parties agreed to have Stansberry's case transferred to Anchorage, and the case was assigned to Superior Court Judge Philip R. Volland.

At a pre-trial conference a few days later, Stansberry's court-appointed defense counsel told Judge Volland, "Mr. Stansberry refuses to see me; we've never had a conversation. It's ... a non-existent relationship." Judge Volland scheduled a hearing to look into Stansberry's competency, but Stansberry refused to be transported to that hearing. In response, Judge Volland rescheduled the hearing, and he directed Judicial Services to transport Stansberry to the rescheduled hearing "by any means, including force."

Stansberry was present for the rescheduled competency hearing on January 27th, but he repeatedly interrupted Judge Volland and the attorneys. Shortly after the hearing began, Stansberry declared:

> Mrs. Farrell [the attorney selected by the Office of Public Advocacy to represent Stansberry] is not representing [me] in this case. Also, I'm [litigating] in the ... Ninth Circuit Court of Appeals.... My case number is 05–36183. [I am] suing the State of Alaska ... in a class action lawsuit—me and my family. So ... I don't need the State to talk to me. I'm also suing Dr. Sperbeck [a psychiatrist who examined Stansberry] and API [the Alaska Psychiatric Institute], and my case is in federal court right now.

In response to these remarks, Judge Volland told Stansberry that it was his choice whether to cooperate with his attorney, but that Stansberry's federal lawsuit did not relieve him of his obligation to comply with the orders issued in the state court proceedings. Stansberry then declared that the State was prosecuting him under "[an] identity [that] is not mine", and that he "[did] not want to [in]crimi[n]ate [him]self ... in the ... courtroom." Stansberry added that he was "[litigating] a federal case", and that he had "nothing else to say at this point".

Stansberry's reference to his federal litigation led to the following colloquy with Judge Volland:

> *The Court:* You've been charged in state court, Mr. Stansberry. And, as I said, Ms. Farrell is the attorney appointed to represent you. And I'll proceed to hear from her, [because] you've not been authorized to represent yourself.
>
> *Mr. Stansberry:* I just told you: she's not representing me ...
>
> *The Court:* It's not your choice, Mr. Stansberry.
>
> *Mr. Stansberry:* It would also violate my constitutional rights, as well [as] unusual and cruel punishment for me[. I am] telling you on [the] record, she is not my attorney.
>
> *The Court:* She is your attorney. It doesn't violate your constitutional rights ...
>
> *Mr. Stansberry:* [Just] because you said she's my attorney, that makes her my attorney? Is that what you're saying? ... Well, I just told you [that] I'm suing [the] Office of Public Advocacy.... I was unprepared to come over here, pretty much at gunpoint, and without my consent, my will, or anything.

Several months later, in August 2006, Judge Volland again took up the matter of Stansberry's competency. By that time, Stansberry had a new attorney: Ms. Sidney Billingslea. At this August hearing, Stansberry again insisted that the proceedings against him were invalid, and he announced that he did not intend to participate any further:

> *The Court:* I set this [case] on [the calendar] for ... [a] hearing ... [to] make sure [that] the parties received the [psychological] evaluation, ... [and] then to find out whether either party contests the evaluation, and [whether] I should either order a second one ...
>
> *Ms. Billingslea:* Judge, I reviewed [the evaluation], and I would appreciate the opportunity to ask [the evaluator] ques-

tions about how she came to the conclusions she did . . .

*The Court:* All right, . . . let's find a hearing date. . . .

*Mr. Stansberry:* Judge, I'm asking the Court to throw this case out, due to violation of my constitutional rights. I have appealed the Ninth Circuit's decision [dismissing Stansberry's habeas corpus litigation] [to the United States] Supreme Court. [And] I'm asking the Court to release me today, and that's—that was my reason [for coming] here. I'm not going to come over [here] any more and let you—all guys insult me verbally or mentally. . . . This case is done. This case—If you—all have a civil action, [then] you need to file it in civil court, because now this is a constitutional issue—a violation. [The State is] falsifying . . . documents and fals[ifying] evidence in this case. . . .

*The Court:* I'm not going to release you, or dismiss the case, Mr. Stansberry. If you choose not to come to court in the future, that's your choice. You can voluntarily absent yourself from these proceedings.

During the ensuing months, Stansberry disregarded Judge Volland's order to communicate with the court through his attorney. Instead, Stansberry continued to file *pro se* motions, referring to himself as his own "Attorney in Fact". In these motions, Stansberry alleged that his constitutional rights were being violated. He sought release on his own recognizance, as well as punitive damages and a pardon from the governor.

At a court hearing on May 21, 2007, Stansberry's attorney (Ms. Billingslea) informed Judge Volland that Stansberry was refusing to cooperate with her until his new round of federal litigation was complete. Billingslea explained that Stansberry refused to meet with her, or with her expert witnesses, or "anybody". At this point, Stansberry interrupted his attorney and spoke directly to the judge:

*Mr. Stansberry:* I'm asking you not to harass me anymore, Philip—Mr. Volland. I'm talking to you.

A few minutes later, Stansberry again interrupted Billingslea, and he once more announced that he considered the proceedings against him to be invalid:

*Mr. Stansberry:* [I am litigating] in federal court for the simple reason that the state courts have violated civil rights of mine . . ., and so I asked the federal courts to intervene for the simple fact that I have [brought] a lawsuit against [the state courts], and it's important if the federal courts do take a look at this, I'm asking the FBI to do a federal investigation. There [were] . . . no reports filed on me [that] I assaulted anybody, none, from anyone of the State of Alaska.

. . .

*The Court:* This is what I'm inclined to do here. I haven't made any findings yet with respect to Mr. Stansberry's competency to stand trial, because I had accorded his counsel the opportunity to question Dr. Fisher. . . . I'll just have to continue this [hearing] again for a period of time to allow for that to happen . . .

*Mr. Stansberry:* I reject anything that you have to say here today in court. I'm counseling my record. [*sic*] You have no power over this case. This case is in federal court. You do not have an indictment . . .

*The Court:* Mr. Stansberry, . . .

*Mr. Stansberry:* You do not have an indictment.

*The Court:* Mr. Stansberry, if you don't be quiet, I'm going to have you removed.

*Mr. Stansberry:* Please have me removed.

*The Court:* All right.

*Mr. Stansberry:* [as he is being removed] Strike this case from the record, please.

On August 20th, Stansberry was brought back to court for another competency hearing. During this hearing, Stansberry continued to interrupt both his attorney and Judge Volland, and he again asserted that the proceedings against him were invalid:

*The Court:* We're back [in court] on Mr. Stansberry's case. I looked at the log notes before we came in, and this appears

to be maybe the fourth or fifth time we've been trying to get . . .

*Mr. Stansberry:* You don't have jurisdiction over this case, Judge. You don't have nothing . . .

*The Court:* . . . some response to . . .

*Mr. Stansberry:* . . . you don't have nothing to say in this case. When you get jurisdiction, that's when you [can] talk to me.

*The Court:* . . . to Dr. Russell's [competency] evaluation of over a year ago, when we had a number of problems doing that . . .

*Ms. Billingslea:* [I would like to] make one more attempt to secure [a competency] evaluation, given the age of the [last] one . . ., and the age of Dr. Sperbeck's initial evaluation. The Court may or may not be aware that [the Office of Public Advocacy arranged for] a doctor [to] come up. Dr. Adler [came] up in 2005, [but the doctor] could not get access to Mr. Stansberry, and therefore [the doctor] could not make any conclusions one way or the other. I can't get funding for another expensive person to come up and not [be] seen by Mr. Stansberry. [So] . . . my first request today is to have the Court . . .

*Mr. Stansberry:* She [*i.e.,* Ms. Billingslea] is not representing me, so I don't know who she's talking about.

*Ms. Billingslea:* Well, I'm trying to represent Mr. Stansberry.

*Mr. Stansberry:* No, you're not representing me.

*Ms. Billingslea:* So . . . I . . . request [the Court] to have Mr. Stansberry evaluated at API one more time, or [that] an attempt [be made] to evaluate him at API one more . . .

. . .

*The Court:* All right. Well, I feel [that I am] between a rock and a hard place here. And I've been frustrated in attempts to get an answer here. Unfortunately, Dr. Russell's evaluation [is] not much of an evaluation, because Mr. Stansberry refused to cooperate. So I lack the level of factual findings that would make

me more comfortable reaching a conclusion of . . .

*Mr. Stansberry:* Talk to Monica Benson [*sic:* Monica Benton], she's out of Washington, the federal judge, the magistrate . . .

*The Court:* . . . competency.

*Mr. Stansberry:* . . . [talk to] her.

*The Court:* [to Ms. Billingslea] But I think your request is a reasonable one. I'll order another evaluation of Mr. Stansberry at API.

*Mr. Stansberry:* Make sure you get the name spelled right.

*The Court:* I think I [will] just order him to be evaluated there. . . .

*Mr. Stansberry:* We reject any offers from the—the state court at this . . .

*The Court:* We probably should . . .

*Mr. Stansberry:* We [are] in federal court . . .

*The Court:* . . . [give] them a date to produce the report. Then, if they want the doctor produced for examination, they know when either party can subpoena him.

*Mr. Stansberry:* You can move this [proceeding] to federal court in Seattle. Under 28 U.S.C. § 1446 . . .

*The Court:* Anywhere between thirty and sixty [days] . . .

*Ms. Billingslea:* Right. Which is why I think it's pretty important to have it done at API, as opposed to at the jail . . .

*Mr. Stansberry:* You ain't got jurisdiction to do anything, Volland.

Shortly after this hearing, the superior court received more *pro se* pleadings from Stansberry. In these pleadings, Stansberry requested dismissal of the criminal charges and millions of dollars in civil damages. Stansberry also asserted that Judge Volland was guilty of a "breach of trust", that his attorney, Billingslea, had committed malpractice, and that both Judge Volland and Billingslea had unlawfully threatened him.

The court held a renewed competency hearing on October 12, 2007. At that hearing, Stansberry continued to assert that the court had no jurisdiction over him, and that Billingslea was not his attorney. Stansberry

also announced that he intended to sue Billingslea for damages.

Ultimately, Stansberry was found competent to stand trial, and Judge Volland scheduled a pre-trial conference for March 11, 2008. Stansberry refused to be transported from the jail to the courthouse for this proceeding. Judge Volland rescheduled the conference for May 6, 2008, and he directed Judicial Services to bring Stansberry to that hearing whether Stansberry agreed or not. At the May 6th conference, Stansberry again challenged the court's jurisdiction over him—asking Judge Volland, "Don't you think you better get an indictment first?"

The next proceeding in Stansberry's case was a trial call on July 22, 2008. Stansberry refused to be transported to this proceeding. The trial call was re-scheduled for July 29th, and this time the Judicial Services officers compelled Stansberry to attend—apparently, through the use of pepper spray.

As the trial call began, Stansberry again accused Judge Volland of impropriety. Stansberry also referred to the fact that he had been forcibly compelled to come to court, and he suggested that someone might get hurt in the future:

*Mr. Stansberry:* [to Judge Volland] You better quit planting this false information and this false reason with doubt [*sic*], Volland. I'll tell you now, you'll get one of these cats hurt. You and this lady here [apparently referring to Billingslea].

*Ms. Billingslea:* Judge, I'm here for Mr. Stansberry's case.

*Mr. Stansberry:* You're not here for me.

*Prosecutor:* Judge, I'm here for the State....

*Mr. Stansberry:* You planted your false information, your false evidence. We'll see. You're going to pay me $10,000 a day for the six years you've owed me in prison.... And I'll ... move this case to federal court, where it's at now, in front of Monica Ben[t]on in Seattle.

*The Court:* We've got this trial here in trailing status. [To Ms. Billingslea] I know you started [another trial] ...

*Ms. Billingslea:* [I] started [the] Jarnig [trial] today. We expect that to be done ...

*Mr. Stansberry:* Get an indictment first.

*Ms. Billingslea:* ... expect that to be done by Tuesday of next week....

*The Court:* All right, then; let's do this: I'm going to take you ...

*Mr. Stansberry:* We're going to request to move this case to federal court, because Philip Volland is planting false reasonable doubt and information, and also Sidney— Mrs. Billingslea, I guess it is.

*The Court:* Let's take you off the trailing trial list, and set this for a date certain to begin August 13th.... So let's do that.

*Mr. Stansberry:* We reject anything from the State. We ask—request for federal court.

*The Court:* I'll just toll [the speedy trial rule] from today until the date certain date of [August] 13th.

*Ms. Billingslea:* And then, Judge, it may serve us to have a brief trial call ...

*The Court:* Do you want [me to make] some time on the 12th to do that?

*Mr. Stansberry:* Get an indictment first, and get jurisdiction.... And Judge, the next time you—all come over [to the jail] and threaten me—[saying that] I got a court date, and I don't. You just heard him, in federal court.

On August 12th (the day of the trial call), Stansberry told the Judicial Services officers that he would refuse to be transported to court unless Judge Volland issued an order directing the officers to transport him by all reasonable means. Hearing this, Judge Volland asked Stansberry's attorney, Ms. Billingslea, whether he should issue such an order, or whether he should instead proceed with the trial call in Stansberry's absence. Billingslea answered that it would not be appropriate to have Stansberry brought to court by violent means, and that she was "comfortable proceeding [that] afternoon without him."

Stansberry came to court the following day, August 13, 2008, for the beginning of his trial, but he again interrupted the proceedings with accusations that he was being held

unlawfully, that the court had no jurisdiction over him, that Judge Volland was guilty of forgery, breach of trust, slander, witness tampering, and obstruction of justice, and that Billingslea had committed malpractice.

In answer to these remarks, Judge Volland told Stansberry:

> *The Court:* I want you to understand a couple of things.... Once trial begins, and [by] that [I mean] once we have our prospective jurors in the courtroom, you have to comport [yourself] with[in] the rules of court. Which means you speak through your attorney; you can't just speak spontaneously any time you wish, as ... you have [been doing], about any topic that you wish. If you do that, and it's disruptive, I'll have to ask you to leave.

Stansberry refused to give Judge Volland an assurance that he would comply with the rules of court. Instead, he declared that Judge Volland was abridging his constitutional rights:

> *Mr. Stansberry:* So are you telling me that my constitutional rights—freedom of choice, and freedom of speech, and freedom of movement—[are] being [taken] from me here today?
>
> *The Court:* What I'm telling you is [that] if you're present here ...
>
> *Mr. Stansberry:* Because if you are, you need to dismiss yourself. [*sic*]
>
> *The Court:* ... if you're here for trial, you'll have to abide by the rules of court—which are that you speak through your attorney, you can't speak ...
>
> *Mr. Stansberry:* She's not my attorney.
>
> *The Court:* You can't speak spontaneously, nor about matters that aren't relevant to the proceeding. If you do, and [if] it becomes a distraction or a disruption, I'll have to have the judicial officers take you out of the courtroom. Do you understand that?
>
> *Mr. Stansberry:* I understand that you're trying to violate my constitutional rights right now, and [I will] ask for a federal [in]junction for you to remove yourself from my case, [and] from my presence. And I will file that in federal court.

A few minutes later, Judge Volland addressed another issue that posed a threat to the orderliness of the trial. Apparently, Stansberry had refused to sit with his attorney, Billingslea, during the recent pre-trial proceedings; instead, he had been sitting in the jury box. Because it would be impossible for Stansberry to continue sitting there once the trial began, Judge Volland asked Stansberry if he would be willing to sit next to Billingslea during the trial. Stansberry refused to agree to this, and he again accused Judge Volland of violating his constitutional rights.

Given Stansberry's responses to these inquiries, Judge Volland asked Billingslea if she had any suggestions or preferences as to how to proceed:

> *The Court:* Ms. Billingslea, there have certainly been times in court where I've noticed [that] when you've tried to talk to Mr. Stansberry, he has not let you get very near him. I don't know if you have any suggestions as to what we can do.
>
> *Ms. Billingslea:* From the cases I read, Judge, one of the worst ... ways to have a person present [in court] is shackled like Mr. Stansberry [currently] is. And it certainly would not be helpful to have him shackled like that. The alternative would be—in the other courthouse, there's [a] courtroom that has [an] observation room in it, where he could observe his trial if he doesn't want to sit next to me. If he doesn't want to have anything to do with me, he could sit there. [That way,] he could be physically present for his trial. I could [go] back [into the observation room] and see if he wanted to ask me questions or talk to me.... Before cross-examination, or before I complete my cross-examination, I could consult with him. In doing that, the jury wouldn't see him in ...
>
> *Mr. Stansberry:* That won't happen.
>
> *Ms. Billingslea:* ... the condition he's in right now—which, you know, is—I mean, he looks like a prisoner that needs to be restrained. So in some ways, that's worse than not being here at all, in my opinion. He does have a constitutional right to be physically present, but it would

be good to advise him that if he doesn't want to wear civilian clothes and if he can't comport his conduct to where he doesn't need to have his arms restrained, then it might be smarter, it might improve his chances, for him not to be here at all, or for him to be seated in a different room where he can observe the ... the trial without being in front of [the jury].

In response, Stansberry told Billingslea:

*Mr. Stansberry:* Don't touch me; don't say anything to me. Negligent. You don't need to say anything to me. You already threatened me once. The State has threatened [me]. We're going to make sure that it stops. But it will not be me sitting in no room while the jury thinks that I'm an animal, and violating my constitutional rights [under] the Eighth Amendment [by] treating me cruel. I'm not going to let you waive [my presence]. [Apparently, to the judge:] I'm not going to let her waive it.

Judge Volland assured Stansberry that "nobody is waiving [your] right [to be present] at this point." Stansberry replied:

*Mr. Stansberry:* You threw me in prison for six years, slandered my name,.... I'm asking for damages at this point. Nothing else really matters [at] this point but bringing you-all to justice.... I'm talking about [the] federal suit filed against both of you-all.

*The Court:* As I told you before, you're going to have the right to [attend the trial] in civilian clothes, Mr. Stansberry. And if you abide by the rules of conduct in the courtroom, you're going to be able to sit at counsel table without handcuffs or without shackles—provided you, again, behave according to what's expected in the courtroom. If you show up on Monday like you're dressed now, and [if you] refuse to put on [the] civilian clothes that are provided by your attorney, [then] you've got to understand that [the] jurors are going to see you in that condition.

Some jurors are going to assume that that means you're in custody. It may be an issue that they keep in the back of their mind, despite what instructions I give them.... [So] I encourage you—because

it's better protection for your rights—that you come [to court] on Monday in the civilian clothes that will be provided to you.

*Mr. Stansberry:* My constitution is threatened [*sic*]—is that what we're talking about? Six years. Yeah, right. And you got jurisdiction over my case. How did this happen? You got a blank endorsement. [And] I guarantee, when I get a chance to get in federal court, I'm going to find out who signed these documents to give you jurisdiction over anything [having to do] with me, period. You're telling me about instructions? Who the hell has the right to give me instructions when you don't even have jurisdiction to tell me how ... I need to act. I always dress myself as a gentleman in this state, and I definitely don't need you telling me how to be a gentleman and conduct myself. That's an insult to me—just ... you and her [*i.e.*, Billingslea] talking that way.

*The Court:* I want you to understand, Mr. Stansberry, that if, on Monday, we start [the trial] and you behave the way you've been behaving today, I'm going to have to ask the Judicial [Services] officers to take you outside of the courtroom, and we're going to proceed with the trial in your absence. There will be some arrangements made so that you can understand what's happening in this courtroom, and be able ...

*Mr. Stansberry:* Sounds like you've already got fraudulent pretenses already set, you and Mrs. Billinger [*sic*]. Is that what it is? Speak now!

*The Court:* Do you understand, Mr. Stansberry, that if you don't ...

*Mr. Stansberry:* Do *you* understand? Is this fraudulent intents what you—all got planned to try to ruin ... my good name?

Judge Volland then conferred with Billingslea about the possibility of conducting the trial with Stansberry viewing the proceedings remotely, if Stansberry continued his obstreperous behavior when the jurors were present. The judge suggested that this approach "[might] be better than [having] him being disruptive [in the jury's presence], and/or ... having [him] be shackled next to

you." Billingslea agreed with the judge's assessment, although she noted that Stansberry's behavior might improve. Judge Volland agreed that any final decision on these issues would have to wait until he saw how Stansberry comported himself when the jurors were present.

Judge Volland and the two attorneys then began discussing the difficulties of jury selection in Stansberry's case, including the need for a jury questionnaire that asked potential jurors whether they had experience with sexual violence. During this discussion, and until the court recessed, Stansberry made repeated interjections: he claimed that he had been denied the assistance of counsel, he accused the prosecutor of suborning perjury, he requested transfer of his case to federal court, and he accused Judge Volland and Billingslea of "fraudulent intent under ... UCC [§ ] 2–312".

Jury selection for Stansberry's trial commenced on August 18, 2008. On that day, Stansberry (acting *pro se*) submitted a pleading to the court purporting to give a power of attorney to Anchorage attorney Rex Lamont Butler, even though there was no indication that Mr. Butler had agreed to represent Stansberry. Stansberry also stated that he had asked Governor Sarah Palin to release him based on "misconduct, obstruction of justice, and malpractice".

Following Stansberry's remarks, Judge Volland asked Stansberry why he was not sitting with his attorney, Billingslea, at the counsel table. The judge noted that he had instructed Stansberry to sit with his attorney during the previous hearing. In response, Stansberry told the judge, "Me and you never made any deal." Stansberry continued to assert that Mr. Butler was his true attorney, and he told Judge Volland that he was not willing to sit with Billingslea during jury selection. Stansberry asserted that he was his own attorney, and that it was against his religion to have a white person represent him. [Stansberry is black; Billingslea is not.]

Judge Volland then asked Stansberry whether he would adhere to the rules of courtroom decorum:

*The Court:* Mr. Stansberry, on Thursday, we talked about [your] right to be here [in court] during your trial. We talked about what you needed to do in order to be here. One of those [things] was to not speak spontaneously, and [to] sit next to your attorney quietly at counsel table. Are you telling me you're unwilling to do that today?

*Mr. Stansberry:* No. [*i.e.*, "Yes, I'm telling you that."]

*The Court:* Okay.

*Mr. Stansberry:* We never made that [deal]. . . . You made oral threats [and told me] that you would like [me to behave that way], and I told you [that] I would not give you venue. [*sic*] . . . I had to file documents on it. So you—[I am] just waiting to file it.

Stansberry continued to assert that Billingslea was not his attorney, and that Butler's office would be representing him. But after Judge Volland noted that there was absolutely no indication Butler intended to undertake Stansberry's case, Stansberry declared that he wished to represent himself.

During the ensuing inquiry regarding Stansberry's ability to represent himself, Stansberry indicated that he would like a mistrial: "Mistrial is ... my decision; and it's definitely going to be a mistrial."

Ultimately, Judge Volland ruled that Stansberry was not competent to represent himself. (That ruling has not been appealed.) The judge then noted that Stansberry "prefers to just speak what's on his mind"— and that, even though the judge thought that Stansberry had agreed to abide by the courtroom rules, "today, ... he's refusing to do [so]."

At this point, Stansberry accused Billingslea of having a conflict of interest, and of committing malpractice. He then declared, "You-all can remove me from court." After Stansberry repeated this statement, Judge Volland took Stansberry's words to be "a decision of Mr. Stansberry to voluntarily absent himself" from the trial proceedings. (This ruling likewise has not been appealed.)

Judge Volland then made the following findings:

*The Court:* Mr. Stansberry clearly indicated that he didn't want to be here ... [,] given [my ruling] that he couldn't represent himself, ... and that Ms. Billingslea [would] proceed as his counsel. Also ... on the basis of his conduct here this morning, I had grave doubts that he would have been able to be present in the courtroom, [to] sit next to Ms. Billingslea, and not constantly interrupt proceedings as he has for the last half-hour or so. We obviously could not proceed with jury selection with [Mr. Stansberry] ... sitting in the very chairs where we have to impanel jurors. Accordingly, I [have] made a decision to proceed with jury selection without Mr. Stansberry being present.

Anticipating that this was a possibility, and not wanting to compromise Mr. Stansberry's rights to see his trial in progress and consult with his counsel, ... [I] found it was possible ... to have both a video link and an audio link with a ... holding cell downstairs, so that Mr. Stansberry can ... watch his trial. Notwithstanding the fact that he apparently decided to [leave] here willingly, I still want him to have the opportunity to watch his trial and consult with counsel. So we'll make sure that [the audio and video] equipment is working before we bring our prospective panel up here [to begin jury selection].

If, at any point, Ms. Billingslea, you want to take a break to consult with [your client], or try to consult with him, you just let the Court know. I'm prepared to make those accommodations....

Judge Volland then proceeded with the first day of jury selection in Stansberry's absence. The judge and the two attorneys agreed that Stansberry retained "the option to come up here if he wants".

Stansberry was present in court the next morning, August 19th, when Judge Volland began the second day of jury selection. Stansberry was in prison garb; he refused to wear civilian clothing. Also, Stansberry still refused to sit with Billingslea. Instead, he occupied one of the chairs in the jury box.

Stansberry again asserted that Rex Lamont Butler and/or his associate, Herman Walker, was going to represent him—even though Billingslea told the court that she had spoken to Mr. Walker the previous afternoon, and that Walker had told her that he did not represent Stansberry.

Judge Volland again warned Stansberry that he would have to comply with court rules—which included sitting with Billingslea at counsel table, and refraining from any spontaneous outbursts. Judge Volland then told Stansberry that the matter was in Stansberry's hands:

*The Court:* It's your choice. You [can] determine whether ... you're going to be here [in the courtroom] personally, or [whether] you're going to watch [the trial] from downstairs [in the holding cell].... I'm going to allow you to participate in [the] trial and watch it, one way or another, and consult with your attorney, one way or another. But as I said, if you're here in the courtroom, you've got to comport with the court rules.

Judge Volland then directed the Judicial Services officers to remove Stansberry's handcuffs—stating, "This is Mr. Stansberry's opportunity to show me that he can behave in court."

The prospective jurors then entered the courtroom, and jury selection recommenced.

Initially, jury selection proceeded uneventfully. However, later in the morning, one of the prospective jurors told Judge Volland that she might have trouble being fair and impartial because of Stansberry's behavior in the courtroom:

*Juror:* To be honest, as you were explaining ... the different [charges], ... I looked over at Mr. Stansberry [and] I kind of saw him smirking a little bit. And I'm not trying to say that he's guilty; that's not what I'm saying, by any means. I'm just saying [that when] you have assault charges against you, [and] they're being read [aloud in court], I don't feel like there's nothing to kind of smirk about.... I don't really feel like he's taking the situation serious[ly].

A few seconds later, Stansberry spoke to this prospective juror directly, saying, "I'm blessed. You don't have to worry about me. I'm innocent."

When the next potential juror stated that he thought he knew Stansberry through prior business connections, Stansberry argued with him:

*Mr. Stansberry:* I don't think that's accurate information. I never worked for an electric company in my life. I own my own private business, so I don't know ...

*The Court:* Mr. Stansberry, please.

*Mr. Stansberry:* Well, we need that on [the] record.

Later in the jury selection process, Judge Volland gave each of the attorneys the opportunity to engage in 45 minutes of individual questioning of the fifteen prospective jurors called to the jury box. The prosecutor went first. Then, when Billingslea began her questioning of the prospective jurors, Stansberry interrupted her:

*Ms. Billingslea:* Good morning, folks—or afternoon. As you might suspect, my job is very different than [the prosecutor's] job, ... but [like the prosecutor, I am also] looking for a fair jury. And I'm looking for people, in particular, who can be fair to Mr. Stansberry, who is sitting over there. And he's a citizen of the United States, and he's a resident of the State of Alaska.

*Mr. Stansberry:* Been a businessman for 25 years in this state. Successful businessman.

*The Court:* Mr. Stansberry, ...

*Ms. Billingslea:* He comes to court dressed in a prison outfit. [And] he is obviously not sitting right next to me in the trial. There are officers standing on either side of him, and I would like for ...

*Mr. Stansberry:* (Indiscernible) I have a lawsuit. I'm asking the question ...

*The Court:* Ladies and gentlemen, we're going to take a ten-minute recess. I'll—Please wait outside the courtroom.

*Mr. Stansberry:* [still in the jury's presence] Six years in prison, without bail or a trial! My constitutional rights have been violated because of my [law]suit. I'm asking for $10,000 a day, so you can make the jury decision. That's what you're basing it on. They ruined my family's business of 25 years. (Indiscernible)

*The Court:* Officers, please escort Mr. Stansberry downstairs [to the holding cell].

*Judicial Services Officer:* Yes, sir.

*The Court:* Mr. Stansberry, you know the rules.

*Mr. Stansberry:* I don't have no rules to go by. For one [thing], you just made a false statement. You do not have jurisdiction over this case, and you're not presiding over this case. This case is in federal court. Put that on the record.

*The Court:* [To the in-court clerk] Madam Clerk, do we need to check and make sure the audio [feed] is [turned] on downstairs [in the holding cell]?

*In-court Clerk:* Yeah, I'll have to go [turn] the feed to—because I know it's not on; I haven't turned it on.

*The Court:* Okay.

Twenty minutes later, when the prospective jurors returned to court, Judge Volland explained that he had removed Stansberry from the courtroom because defendants are not allowed to speak directly to the jurors unless they take the stand and give testimony. The judge also explained that Stansberry would still be able to see and hear the trial, through audio and video transmission of the proceedings—but that, "at least for the next 15 minutes or so, he won't be with us."

(The judge referred to Stansberry being absent for "the next 15 minutes or so" because it was about 1:15 in the afternoon, and the court was scheduled to recess for the day at 1:30.)

Judge Volland admonished the jurors that, despite Stansberry's behavior, he was still presumed to be innocent. The judge asked the jurors to raise their hands if they believed that the incident they had just witnessed would adversely affect their ability to give Stansberry a fair trial. (Apparently, none of the jurors raised their hand.)

Stansberry refused to be transported to court on the following day (August 20th). When court convened, Judge Volland asked Billingslea whether she wanted him to issue an order compelling Stansberry's attendance. Billingslea did not ask the judge to issue such an order. She told Judge Volland that Stansberry was not communicating with her,

that his animosity toward her had escalated, and that he was not giving her any input during jury selection.

Judge Volland then noted, for the record, that Stansberry had a long history of either refusing to come to court, or coming to court and then refusing to comply with the rules of procedure and decorum. The judge also noted that Stansberry "wouldn't let counsel get within five feet of him ... [and he] clearly never would sit near counsel or allow any communication with counsel"—thus making it "virtually impossible for counsel to communicate with him about decisions affecting the selection of jurors."

Nevertheless, Judge Volland declared that he wished to give Stansberry "at least ... one other chance":

> *The Court:* If he wants to be here, I'll give him the opportunity to show that he can comply with court rules—because he was able to do that at least once. But in all candor, I can't tolerate and won't tolerate any continued outbursts [from] him. I'm not going to permit him to create a mistrial. I'm not going to permit him to influence jurors by his outbursts to any extent. But if he says he's willing to comply with the rules, I'll give him one more chance.

After Judge Volland announced this ruling, the attorneys gave their opening statements, and then court was recessed for the day.

The next day (August 21st), Stansberry voluntarily came to court, but he still refused to give Judge Volland an assurance that he would refrain from speaking spontaneously. Instead, Stansberry told the judge, "My federal agents should be present today, so I'm waiting on them[.]" Judge Volland responded by warning Stansberry one more time:

> *The Court:* I just want it to be abundantly clear to you: ... I'm not going to let you create prejudice ... against yourself or [in your] favor in this trial ..., or [to] create a mistrial. So one more outburst, [and] you'll be removed from the courtroom.

Stansberry replied, "We [will] enter our mistrial today, then[.]"

Later that day, the prosecutor presented the testimony of C.R., one of Stansberry's victims, who had been a 15–year–old high school student at the time of the sexual assault. C.R. described the events leading up to the assault, and then she described the details of the assault. The prosecutor then asked C.R. to identify her assailant. At that point, Stansberry engaged in the behavior that caused Judge Volland to remove him from the courtroom for the remainder of the State's case:

> *Prosecutor:* Now, [Ms. R.], there's a gentleman that's seated to my left, and to your right, wearing a yellow shirt.... Could you take a look at him, briefly?
>
> *Judicial Services Officer:* [to Stansberry] Sit down. Sit down. Settle down.
>
> *Mr. Stansberry:* She's gonna identify me—see if she know me.
>
> *Prosecutor:* Do you recognize that gentleman?
>
> *C.R.:* Yes.
>
> *Prosecutor:* Okay. Is that ...
>
> *The Court:* We're taking a recess here, ladies and gentlemen.... Officers, please remove Mr. Stansberry. He can watch [the proceedings from] downstairs, if he wishes.

Judge Volland then made the following findings:

> *The Court:* I gave Mr. Stansberry clear instructions and fair warning that one [more] outburst would mean that he'll be removed from the courtroom. Given his conduct here [today], [as well as] his spontaneous conduct with other prospective jurors yesterday—one of whom reported to the court that she was intimidated by his direct statements to her—at this point, I have no confidence that Mr. Stansberry will not continue to spontaneously make comments that can have any number of effects—either generating sympathy ... for him, [or] intimidating witnesses, [or] influencing jurors, or simply disrupting the trial. Because of that, I felt compelled ... to remove Mr. Stansberry from the courtroom [and] allow him to participate by watching the trial downstairs.

Other [alternatives] that might [allow] me to have him ... present [here] really aren't workable. Mr. Stansberry's disruption is primarily verbal. I can't have him gagged here in the courtroom. That would be far more prejudicial to him, I think, than participating [in] the trial remotely by being downstairs watching the video and listening to the audio hookup. [And] putting him in shackles or [in] additional handcuffs [is not] going to prevent him from shouting out things spontaneously, as he has just done.

Mr. Stansberry ... clearly ... understands the rules here. He's able to conform his conduct [to those rules] for awhile, until he chooses not to.... [H]e [has] forfeit[ed] his right to be personally present at trial.

The prosecutor then added that Stansberry's most recent outburst had not been merely verbal, but physical as well: "When I was asking for the [witness's] identification, [Mr. Stansberry] stood up and started making a motion ..., [and] that's when [Judicial Services] told him [that] he needed to sit down[.]" The defense attorney agreed with the prosecutor's characterization of this incident, and she asked for a mistrial:

*Ms. Billingslea:* An accuser in a sexual assault case is [asked] for the very first time ... to actually look at the accused, Mr. Stansberry—and when she does, [Mr. Stansberry] gets to his feet in a fairly abrupt way, and ... three ... [Judicial Services] officers kind of put him down in the chair. I think that [this incident] had a visual and emotional impact on the jury that may affect their ability to be fair and impartial. And so, for the record, I'm going to ask this court for a mistrial[.]"

In response to this request for a mistrial, Judge Volland spent a significant amount of time questioning each juror individually to see whether the juror could still render a fair and impartial verdict despite Stansberry's outburst and his removal from the courtroom. Based on the jurors' answers, Judge Volland denied the defense motion for a mistrial.

Judge Volland also addressed the question of whether Stansberry would be permitted back into the courtroom.

*The Court:* I can't permit him to come back into court, [because] I can't conduct this [kind of] inquiry [of the jurors] every time that Mr. Stansberry does something or [makes] a statement.... At some point[,] [his misconduct becomes] cumulative and ... [a complete] distraction from the trial.

I realize that his absence ... creates some problems for both parties.... But nonetheless, I'm convinced that Mr. Stansberry will receive a fairer trial if he's not physically present in the courtroom. And my decision is that he not be.

I can't preclude Mr. Stansberry from making application to me again that he wants to come back and behave. If he does, I'll cross that bridge [at that time].

But [for now,] my decision ... is that he's not going to be permitted in the courtroom. I will continue ... to make the remote [audio-video] equipment available to him downstairs [in the holding cell], so he can watch and listen [to the proceedings], and communicate with counsel. I'll make that clear to Judicial Services, so that he can choose to participate in that manner, any day that he wishes. And he'll be afforded that opportunity each morning.

I'll have to bring him back [physically] to court to determine whether or not he wishes to testify in this case. If he wishes to testify I will, of course, allow him to be here personally, and to testify personally on the witness stand. I also believe it will [be] incumbent on me to bring him back [to the courtroom] if there's a verdict returned, so [that] he's physically present when the verdict is returned.

... There may be other situations where counsel wants him here, but then we're going to have to weigh the risks that that creates, if there's any other outbursts. As I said, [given the] record here, ... I'm concerned that any continued outbursts are just going to be too large of a problem in the trial. And that the only way for [Mr. Stansberry] to get a fair trial is for

him not to be here, and to participate by our remote arrangement. . . .

Whether or not he decides to stay at Cook Inlet, his [corrections] facility, or to come here [to the courthouse and observe the proceedings from the holding cell] downstairs, I'll make whatever accommodations during the trial that are necessary to enable counsel to communicate with him. I know it will be difficult [if he chooses not to be] physically here, but I'll take long recesses if that's necessary, or [recesses] at certain junctures, so that counsel can effectively communicate with him if necessary.

Having made this ruling, Judge Volland then summoned a Judicial Services officer and instructed him that Stansberry was to be placed on the Cook Inlet transportation list every day, so that he could come to the courthouse and monitor the trial from the holding cell, if he chose to do so. Judge Volland also instructed the Judicial Services officer that, if Stansberry declined transportation to the courthouse and instead chose to stay at the Cook Inlet corrections facility, Judicial Services would be required to notify Judge Volland of Stansberry's choice, so that Judge Volland could put that on the record.

On the next day of Stansberry's trial (August 25th), Stansberry chose to come to the courthouse, and he monitored the proceedings from the holding cell, but he asked to be returned to Cook Inlet before the proceedings recessed for the day. He followed the same pattern the next day (August 26th)— coming to the courthouse in the morning, but asking to be returned to Cook Inlet before the trial recessed for the afternoon.

On August 27th, Stansberry again accepted transportation to the courthouse, but he returned to Cook Inlet on the 10:00 a.m. shuttle.

On the next day of trial (September 3rd), Stansberry was apparently unwilling to come to the courthouse, but Judicial Services compelled him to accept transportation. When Stansberry arrived, he declined to watch the proceedings. Stansberry came to the courthouse the next day, but again he refused to watch the trial.

On the next day of trial (September 8th), Stansberry was present at the courthouse, and he was allowed to return to the courtroom when he indicated that he wished to testify in his own defense. After Stansberry completed his testimony, Judge Volland decided that Stansberry could remain in the courtroom, since Stansberry had complied with courtroom rules and decorum during his testimony. However, Stansberry declined to remain in the courtroom.

The following day (September 9th), Stansberry accepted Judge Volland's offer to return to the courtroom, but he soon resumed the type of behavior that led Judge Volland to bar him from the courtroom. Before the jury entered the courtroom, Stansberry claimed that he was authorized to proceed as his own counsel, and he said that he intended to inform the jury of various documents "under the Freedom of Information Act".

After Stansberry stopped speaking, Judge Volland summoned the jurors, and the prosecutor commenced his summation. Within minutes, Stansberry interrupted the prosecutor's summation—asserting that the prosecutor was offering the jury "fantasies" and "false allegations". Stansberry also declared that he was willing to personally answer any questions that the jurors might have. Stansberry's remarks led to the following colloquy with Judge Volland:

> *The Court:* Mr. Stansberry, you were polite and cooperative yesterday. You abided by the restrictions that I imposed. . . . Are you going to do that today?
>
> *Mr. Stansberry:* These false allegations . . .
>
> *The Court:* Are you going . . .
>
> *Mr. Stansberry:* . . . is—is—I . . .
>
> *The Court:* . . . to do that today? Mr. Stansberry: Are you going to comply with my request today?
>
> *Mr. Stansberry:* I'm—I'm going to be removed. If the jury needs to speak to me, I will speak to the jury after they deliberate. . . . I can't sit there and [take] that humiliation.

After Stansberry was removed from the courtroom, he declined to watch the remainder of the day's proceedings on the audio-

video feed. However, through a Judicial Services officer, Stansberry asked Judge Volland to allow him to return to the courtroom so that he could personally present his own summation to the jury. Judge Volland denied that request (with Billingslea's concurrence).

Stansberry later declined to be present when the jury returned its verdicts on September 11th.

### Stansberry's arguments on appeal

■ Stansberry first argues that his behavior, while inappropriate, was not so disruptive as to justify Judge Volland's decision to remove him from the courtroom. We disagree. Stansberry repeatedly denied that the court had any authority over him. He repeatedly asserted that he was the victim of injustice and fraud on the part of the prosecutor, the defense attorney, and the trial judge. And he repeatedly told Judge Volland (in so many words) that he could not sit quietly in the courtroom and abide by the rules of procedure and decorum—that, instead, he felt compelled to spontaneously express his feelings about what was happening to him.

It is true that the particular incident that led to Stansberry's removal from the trial proceedings—his act of standing up when the prosecutor asked C.R. to identify him—does not seem to be an egregious violation of courtroom decorum, if considered in isolation. But this incident should not be viewed in isolation. Rather, it was but one instance of the obstreperous behavior that Stansberry engaged in over the years of court proceedings in this case.

Moreover, it appears that Stansberry's misbehavior on this occasion may have consisted of more than simply standing up without being asked. The transcript shows that the Judicial Services officers who were on duty next to Stansberry told him not only to "sit down", but also to "settle down". The prosecutor stated for the record that Stansberry "stood up and started making a motion". And the defense attorney agreed with the prosecutor's characterization of this incident, stating that Stansberry "[got] to his feet in a fairly abrupt way". She argued that

Stansberry's behavior, coupled with the Judicial Services officers' reaction to it, *required* a mistrial.

This is an instance where, under the "abuse of discretion" standard of review, we are required to defer to the trial judge's perception of the event-in particular, the extent and the potential prejudice of Stansberry's misbehavior.

■ Stansberry also argues that, even if his behavior might have justified Judge Volland in removing him from the proceedings, the judge should nevertheless have given him additional warnings before ordering his removal. Again, we disagree.

Judge Volland repeatedly gave Stansberry express warnings that he would be removed from the courtroom if he did not control his spontaneous comments concerning the perceived injustice of the proceedings and the perceived bad faith of the other participants in the proceedings. And as we have explained, Stansberry's consistent response to these warnings was to deny Judge Volland's authority over him, or to declare that he had no choice but to voice his opinions.

For instance, when Stansberry interrupted the jury selection process to declare to the jurors that he had been held in prison for six years without bail, that his constitutional rights had been violated, and that his business had been ruined, Judge Volland admonished Stansberry to obey the rules, and Stansberry responded that he was not bound by the rules:

> *The Court:* Mr. Stansberry, you know the rules.
>
> *Mr. Stansberry:* I don't have no rules to go by.... You do not have jurisdiction over this case, and you're not presiding over this case. This case is in federal court. Put that on the record.

On that occasion, Stansberry missed only a few minutes of the proceedings—because the court was scheduled to recess for the day quite soon after that.

Stansberry refused to be transported to the courthouse the following day (when the parties delivered their opening statements), so his absence from that day of his trial was

voluntary. The day after that, Stansberry was again in court, but he refused to give Judge Volland an assurance that he would refrain from speaking spontaneously. Judge Volland responded by warning Stansberry once more that he would not tolerate any more outbursts—and that, if Stansberry insisted on continuing his disruptive behavior, he would again be removed from the courtroom. Stansberry replied, "We [will] enter our mistrial today, then[.]"

■ Soon after that, Stansberry abruptly stood up during C.R.'s testimony, and Judge Volland ordered Stansberry removed from the courtroom. It is true that Judge Volland did not give Stansberry an additional warning at that time—but as we pointed out early in this opinion (in the section dealing with the applicable law), there is no requirement that the judge's warnings immediately precede, or be contemporaneous with, the defendant's removal from the courtroom. Rather, the trial judge can rely on previous warnings, if those warnings adequately conveyed that the defendant would be removed from court if the disruptive behavior continued. *Douglas II*, 214 P.3d at 321. Here, Judge Volland's warnings to Stansberry amply satisfied this requirement.

Stansberry was absent for the rest of the State's case, but he returned to court to testify in his own behalf. At that time, Stansberry's behavior was appropriate, and (because of this) Judge Volland invited Stansberry to remain in court for the rest of the proceedings. But a few minutes into the prosecutor's summation to the jury, Stansberry again engaged in disruptive behavior. He declared to the jurors that the prosecutor was offering them "fantasies" and "false allegations", and offering to personally answer any questions that the jurors might have. As we explained earlier, Stansberry's remarks led to the following colloquy with Judge Volland:

> The Court: Mr. Stansberry, you were polite and cooperative yesterday. You abided by the restrictions that I imposed.... Are you going to do that today?
>
> Mr. Stansberry: These false allegations ...
>
> The Court: Are you going ...

Mr. Stansberry: ... is—is—I ...

The Court: ... to do that today? Mr. Stansberry: Are you going to comply with my request today?

Mr. Stansberry: I'm—I'm going to be removed. If the jury needs to speak to me, I will speak to the jury after they deliberate.... I can't sit there and [take] that humiliation.

In sum, Judge Volland repeatedly warned Stansberry concerning the consequences of his disruptive behavior, and Stansberry repeatedly responded by denying the judge's authority or by declaring that he could not (or would not) refrain from disrupting the proceedings. No further warnings were required.

■ Finally, Stansberry argues that even if his behavior justified his removal from the proceedings, and even if Judge Volland adequately warned him that he would face this consequence if he persisted in his behavior, Judge Volland nevertheless committed error by failing to inform Stansberry that he could regain his right to attend the proceedings if he amended his behavior.

Stansberry concedes that, several times during the proceedings, Judge Volland explicitly stated that if Stansberry reformed his behavior, he would be allowed to return to court. However, Stansberry claims that he was never present in court to hear these words—that Judge Volland always said these things *after* he ordered Stansberry's removal from the courtroom. Stansberry acknowledges that his attorney was present in court when Judge Volland said these things, but Stansberry argues that the record shows that he barely communicated with his attorney, and that it is therefore unlikely that he himself was ever apprised of what Judge Volland said.

But even though Stansberry may not have been personally present in the courtroom when Judge Volland explained that he could regain his right to attend the proceedings, this does not mean that Stansberry failed to hear what Judge Volland said.

As we have explained, when Stansberry himself asked to be removed from the court-

room on the first day of jury selection, Judge Volland announced that he intended to make sure that Stansberry could see and hear the entire proceedings from the holding cell downstairs:

> *The Court:* Anticipating [that Stansberry might not be present in the courtroom], and not wanting to compromise Mr. Stansberry's rights to see his trial in progress and consult with his counsel, ... [I have arranged for] both a video link and an audio link with a ... holding cell downstairs, so that Mr. Stansberry can ... watch his trial. Notwithstanding the fact that he apparently decided to [leave] here willingly, I still want him to have the opportunity to watch his trial and consult with counsel. So we'll make sure that [the audio and video] equipment is working before we bring our prospective panel up here [to begin jury selection].

As this quotation shows, Judge Volland did not intend to resume the proceedings until he was satisfied that Stansberry could see and hear everything.

Several minutes later, Judge Volland and the attorneys discussed whether Stansberry could resume attendance of the trial proceedings:

> *Prosecutor:* If you read [the] *Douglas* [decision], ... it seems that one of the major things ... the Court needs to do is make sure [that,] if he wants to reform himself and ... come back to court, ... there needs to be some kind of process in which we [allow him to] do that. My suggestion [is] that ... we just get a [Judicial Services] officer [to tell us] every day ... [whether Stansberry] won't come into court today, or he will come into court today.... [And] I think we should do that on the record.
>
> *The Court:* I agree. At least in the process of jury selection here, my intention was to give him an opportunity each day to tell me whether or not he wanted to be here. And I think once we swear our jury [*i.e.*, once jeopardy attaches]—well, I'll see. If I have a track record [at that time] of him not wanting to come back once we swear our jury, it becomes a little riskier, then, to bring him back, if it's just going to

be [another] outburst. But I intend to ... affirmatively ... see whether he wants to come back, and give him the opportunity to change his behavior and be [present] here....

A few minutes after that, just before jury selection resumed, Judge Volland went on record again because the prosecutor alerted him to a problem:

> *Prosecutor:* Judge, [Judicial Services] Officer Dunn ... informed us [apparently, the prosecutor and the defense attorney] before you came in [to the courtroom] that Mr. Stansberry no longer wants to sit in the cell downstairs [that has] the video linkup that we just put together.
>
> . . .
>
> *The Court:* Okay. Officer Dunn—[well,] first of all, I take it that Mr. Stansberry was taken down to the cell that has the video and audio link?
>
> *Officer Dunn:* Yes, Your Honor.
>
> *The Court:* Okay. And was it operable in his cell?
>
> *Officer Dunn:* [Yes, the] audio and video were both on....
>
> *The Court:* [And] has he now indicated that he doesn't want to be there?
>
> *Officer Dunn:* That is true. [So] we moved him over to a cell without the audio and video.
>
> . . .
>
> *The Court:* Officer, you have my direction, first of all, to tell Mr. Stansberry that any time he wants to go back into the cell with the video and audio link, he can tell you that. If he tells you that [at] any time during the day, [you should] take him back in there, and let us know, so we can make sure that the equipment is operable.
>
> *Officer Dunn:* Yes, Your Honor.
>
> *Prosecutor:* And, Judge—actually the direction should be [that] if he wants to go [back] into that [cell], or if he wants to come back up here [to the courtroom]—I mean, ... at this point, it seems [that it should] be his option, and if he wants ...
>
> *The Court:* Right.
>
> *Prosecutor:* ... to reform ...

*The Court:* He can have the option to come up here [to the courtroom] if he wants ...

*Officer Dunn:* Yes, Your Honor.

*The Court:* Okay. All right. Let's get our [prospective] jurors and otherwise proceed.

...

*In–Court Clerk:* Judge, do you want me to ... keep up the [audio-video] link? ...

*The Court:* Yeah. Let's keep it up for now.

This record strongly suggests that, even though Stansberry may have been in the holding cell when the prosecutor and Judge Volland made their initial remarks about Stansberry's right to return to the courtroom, Stansberry was able to hear what they said—and, thus, he knew that he would be allowed to return to the courtroom if he altered his behavior.

This record also strongly suggests that even if Stansberry did not hear what the prosecutor and Judge Volland said about his right to return—either because Stansberry had not yet reached the holding cell with the audio-video link, or because Stansberry had already demanded to be moved to a different holding cell—this problem was cured when essentially the same information was conveyed to Stansberry by the Judicial Services officer.

Moreover, this same issue—Stansberry's right to return to the courtroom if he controlled his behavior—came up again on the next day of trial (*i.e.,* the second day of jury selection). When court convened that day, Stansberry was again present in the courtroom—apparently, because he asked to be present. At that time (as we have already explained), Judge Volland again warned Stansberry that he would have to comply with the rules of procedure and decorum. Judge Volland then told Stansberry that the question of his continued presence in the courtroom was in Stansberry's hands:

*The Court:* It's your choice. You [can] determine whether ... you're going to be here [in the courtroom] personally, or [whether] you're going to watch [the trial] from downstairs [in the holding cell].... I'm going to allow you to participate in [the] trial and watch it, one way or another, and consult with your attorney, one way or another. But as I said, if you're here in the courtroom, you've got to comport with the court rules.

Judge Volland then directed the Judicial Services officers to remove Stansberry's handcuffs—stating, "This is Mr. Stansberry's opportunity to show me that he can behave in court."

In spite of all this, it remains theoretically possible that Stansberry never learned of his right to return to the courtroom if he amended his behavior. The superior court was never asked to make a finding on this issue. But given this record, the possibility that Stansberry did not understand that he could return to court if he behaved himself is speculative at best. The record gives every reason to believe that Stansberry *did know* that he could return to the courtroom if he behaved himself. Indeed, Judge Volland repeatedly allowed Stansberry to return to the courtroom until (on each occasion) his behavior again became disruptive.

In sum, it is Stansberry's burden to demonstrate that he was never informed of this right, and he has not met that burden.

*Conclusion*

The judgement of the superior court is AFFIRMED.